UNITED STATES of America and
Kenneth J. Kalemba, Special Agent,
Internal Revenue Service,

v.

AMERADA HESS CORPORATION,
Appellant.

No. 79–1317.

United States Court of Appeals,
Third Circuit.

Argued Oct. 19, 1979.

Decided Jan. 18, 1980.

Stuart K. Radick, Kelsey, Kelsey & Radick, Trenton, N. J., Robert G. Morvillo (argued), Maurice M. McDermott, Obermaier, Morvillo, Abramowitz & Fitzpatrick, New York City, Roger B. Oresman, Russell E. Brooks, Milbank, Tweed, Hadley & McCloy, New York City, for appellant Amerada Hess Corp.

Robert Del Tufo, U. S. Atty., Newark, N. J., M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Charles E. Brookhart, R. Bruce Johnson (argued), Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellees.

Before GIBBONS and HIGGINBOT-HAM, Circuit Judges, and ZIEGLER,* District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Amerada Hess Corporation (Amerada) appeals from a final order of the district court directing enforcement, pursuant to 26 U.S.C. §§ 7402(b), 7604(a) (1967), of two Internal Revenue Service (IRS) summonses. Amerada resisted enforcement: (1) because the summonses were issued for an improper criminal investigative purpose; and (2) because one summons sought information protected by the attorney-client privilege and the work product rule. The district court rejected these contentions. We affirm.

### I. *Pre-Enforcement Proceedings*

In May 1975, a revenue agent of the Audit Division (presently the Examinations Division) of IRS commenced a civil audit of the federal tax returns of Amerada for the tax years 1972 through 1974. The IRS investigation coincided with what was apparently a much larger investigation of certain activities of major corporations, involving possible corporate payments to foreign officials and citizens which were suspected of having been improperly treated by the corporations on their tax returns. Simultaneously, the Securities Exchange Commission had filed lawsuits against several major corporations, three of which, like Amerada, were oil companies, alleging the failure of the corporations to disclose improper foreign payments. Amerada's outside counsel, Milbank, Tweed, Hadley & McCloy (Milbank), advised Amerada to conduct an internal investigation to inform the corporate management of any such foreign payments Amerada might have made. In April 1976, Amerada established a special internal investigative committee, consisting of four outside directors, for which Milbank conducted a series of interviews of Amerada officers and employees. Upon completion of this internal investigation, the special committee filed its report with Amerada's board of directors. The committee's report revealed what were termed as "questionable practices," including payments and gifts to local officials, political candidates, and foreign officials, totalling approximately $12,000. In that section of the committee's report to the board of directors which dealt with the procedure of the investigation it was reported that fifty of Amerada's officers and employees had been interviewed by Milbank. The committee's report indicated in a footnote that a list of the names of the persons interviewed was attached. For some reason, however, the list was not attached to the report and the footnote was not corrected. It is not disputed that such a list was in fact included with the report of Milbank to the special committee and is in Amerada's possession. Amerada furnished the revenue agent with a copy of the special committee report to its board of directors, but not with the Milbank report to the committee or the list of persons Milbank had interviewed. Amerada also furnished the revenue agent with answers to eleven standard questions which the IRS had formulated and addressed to major corporations seeking information about improper payments.

In June 1977, as a result of the information in the special committee report and of Amerada's answers to the eleven questions, the revenue agent suspended his examination and made a fraud referral to the Intelligence Division of IRS, now designated the Criminal Investigation Division. Special Agent Kenneth J. Kalemba was assigned to join the Amerada case to investigate possible criminal violations of the Internal Revenue Code in addition to civil liability for unpaid taxes and penalties. Kalemba, after evaluating the Audit Division's reference, requested, and received, from his superior in the Intelligence Division permission to open a file on Amerada.

---

* Honorable Donald E. Ziegler, United States District Judge for the Western District of Pennsylvania, sitting by designation.

On September 5, 1977, Special Agent Kalemba, his Intelligence Division supervisor John Kuper, and William Huntley of the Audit Division, met with representatives of Amerada, including counsel. In this meeting the Amerada representatives were told by representatives of the IRS that the civil audit would, if Amerada preferred, be suspended pending Kalemba's criminal investigation, but that if Amerada preferred to have the civil audit continue document requests made by the revenue agent and those made by the Special Agent would be separately identified. During the meeting Special Agent Kalemba requested a list of documents. The list was prepared by him and not by the revenue agent. Amerada's counsel requested time to consider the request. Some time after the September meeting a representative of Amerada informed Kalemba that before it would respond to his document request it wished to seek review by higher authorities in the IRS of the decision to initiate a criminal investigation. In October 1977, Amerada's counsel asked David E. Gaston, Chief of the IRS Criminal Tax Division, to review the matter. Mr. Gaston referred the request to the Chief of the Intelligence Division, who in turn referred it to the District Director of the Newark District. A meeting with the District Director in Newark was scheduled for mid-January 1978. Before it took place Special Agent Kalemba issued the two summonses for which enforcement is sought. They require production of the same documents Kalemba requested at the September 5, 1977, meeting. One summons asks for production of the list of names of persons interviewed by Milbank on behalf of the special committee. The second asks for nine categories of Amerada corporate documents.[1] Amerada resisted enforcement of both summonses as issued for an improper criminal purpose, and of the first as requiring the production of protected materials.

## II. *Enforcement Proceedings*

When Amerada refused to comply with the summonses the United States and Special Agent Kalemba filed a Section 7402(b) and 7604(a) complaint and obtained an order directing Amerada to show cause why it should not be ordered to comply. Amerada filed an answer and opposing affidavits. It also served on IRS employees subpoenas duces tecum for the production of the entire case file of the Intelligence Division for the tax years in issue, and notices of deposition of various IRS employees. The government moved to quash the subpoenas and for a

1. The second summons requests:

1. All documents and records relating to payments by taxpayer of $613 in 1973, and $718 in 1974, to Husseim Awadba, a resident of Abu Dhabi.

2. All documents and records for purchases of pen and pencil sets ($748), vases, ashtrays, and crystal ($1,158), and a television set ($1,200) made by taxpayer and given to government employees of Abu Dhabi.

3. All documents and records for payments made by taxpayer totalling $2,485 in 1972, $2,810 in 1973, and $2,545 in 1974 to members of the local fire and police departments that were recorded as cleaning services.

4. The aircraft records or log books of taxpayer's airplanes, showing arrivals, destinations, passengers, and purposes of trips on several specific days during 1971 through 1974.

5. All employment contracts or agreements between taxpayer and Azar-Pey and Chadami-Navai, both Iranian government officials, all documents and records relating to payments made to them, and all executive files and inter-departmental memoranda pertaining to their employment by taxpayer for the years 1972, 1973, and 1974.

6. All documents and records pertaining to taxpayer's contributions to U. S. Virgin Islands Congressional Delegate DeLugo, the Julia Butler Hansen for Congress Committee, and Virgin Islands Senator Rouss, all in 1972.

7. All employment contracts or agreements between taxpayer and Dr. Raymond Burneo, Ecuadorian Ambassador to West Germany, as well as all documents and records relating to payments to him for 1972, 1973, and 1974.

8. All employment contracts or agreements between taxpayer and J. Yagchi, a resident of Abu Dhabi, as well as all documents and records pertaining to payments made to him during the years 1972, 1973, and 1974.

9. All documents and records pertaining to an entry totalling $1,250,000 by the Hess Oil Virgin Islands Corporation which was categorized as contributions and donations to the Virgin Islands Government by the Hess Oil Virgin Islands Corporation in 1973.

protective order with respect to the depositions. The trial court permitted a deposition of Special Agent Kalemba. It reserved determination of the motion to quash subpoenas, requiring that the witnesses on which they were served remain available for a hearing on the order to show cause. At that hearing Special Agent Kalemba testified and was extensively cross-examined. His testimony establishes that the IRS decision to open a criminal investigation was made as a result of the disclosures in the special committee report to Amerada's board of directors, that the revenue agent's audit was suspended at the time the IRS summonses were issued, that the information sought is not in possession of the IRS, that it is information relevant to the purpose of determining Amerada's tax liability, and that because such tax liability had not yet been determined he had not yet decided whether or not to recommend prosecution. The court also heard the testimony of two other persons: revenue agent Caputo of the Audit Division, who testified that a civil audit of Amerada for the years in question was incomplete; and Roger B. Oresman, an attorney with Milbank, and a member of the Amerada special committee, who testified primarily about the creation of the special committee and the manner in which Milbank conducted an investigation on its behalf. Oresman's testimony established that the list of interviewees, which is the subject of the first IRS summons, was annexed to a report by Milbank to the special committee. Finally, the trial court examined, *in camera*, the Intelligence Division file on Amerada.

The trial court held that no additional discovery was appropriate in order to rule on Amerada's *LaSalle-Genser*[2] objection, that the objection was meritless, and that neither the attorney-client privilege, nor the work product rule, prevented disclosure of the list of interviewees.

**2.** *See United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); *United States v. Garden State Nat. Bank*, 607 F.2d 61 (3d Cir. 1979); *United States*

### III. *The LaSalle-Genser Objection*

In *United States v. Genser*, 595 F.2d 146, 152 (3d Cir. 1979) (*Genser II*) this court discussed the circumstances in which a taxpayer would be entitled to discovery against the government in order to meet the burden of overcoming the presumption of validity applicable to an IRS summons issued prior to a recommendation of prosecution. We held:

. . . At a minimum, the taxpayer should be entitled to discover the identities of the investigating agents, the date the investigation began, the dates the agent or agents filed reports recommending prosecution, the date the district chief of the Intelligence Division or Criminal Investigation Division reviewed the recommendation, the date the Office of Regional Counsel referred the matter for prosecution, and the dates of all summonses issued under 26 U.S.C. § 7602. Furthermore, the taxpayer should be entitled to discover the nature of any contacts, relating to and during the investigation, between the investigating agents and officials of the Department of Justice.

Where this information or other evidence introduced by the taxpayer reveals (1) that the IRS issued summonses after the investigating agents recommended prosecution, (2) that inordinate and unexplained delays in the investigation transpired, or (3) that the investigating agents were in contact with the Department of Justice, the district court must allow the taxpayer to investigate further. In proper cases, this investigation could include the opportunity to examine the IRS agents or officials involved, or to discover documents. Such examination/discovery, however, should be carefully tailored to meet the purpose of the inquiry. On the other hand, where this information indicates that none of these three conditions are present, the district court need inquire no further.

*v. Serubo*, 604 F.2d 807 (3d Cir. 1979); *United States v. Genser*, 595 F.2d 146 (3d Cir. 1979) (Genser II); *United States v. Genser*, 582 F.2d 292 (3d Cir. 1978) (Genser I).

■ In this case Amerada knew the identities of the investigating agents, the date their investigation began, and the fact that · no recommendation for prosecution had yet been made. It deposed Special Agent Kalemba, and neither in his deposition, nor in cross-examination, was any information elicited suggesting any communication between the IRS agents and the Department of Justice. The only evidence of delay in the investigation is delay occasioned by Amerada's effort to have it terminated. We are dealing with summonses issued prior to the time the investigating agents made a determination on prosecution. Under *Genser II* the trial court's conclusion that no further discovery was in order was a permissible exercise of its discretion. *See also United States v. Serubo*, 604 F.2d at 813.

■ Amerada contends that it has shown an improper purpose because the summonses were for information sought by Special Agent Kalemba, not by the revenue agent in charge of the audit. It argues that the IRS had made an institutional decision to divide its investigation into separate civil and criminal segments, and that as a matter of law any summonses issued at the behest of the special agent conducting the criminal segment must be improper. That argument proves too much. Clearly the IRS has, in all cases, made an institutional decision to divide its investigations into civil and criminal segments. The very existence of separate Examinations and Criminal Investigation Divisions demonstrates such a decision. But the fact that summonses are issued for criminal enforcement purposes is not dispositive. The use of summonses after the abandonment of a civil purpose is the evil against which the *LaSalle-Genser* rule guards. It is undisputed that Amerada's civil liability is still an open question. *See United States v. Garden State Nat. Bank*, 607 F.2d at 65 n.3, 73.

■ Amerada also contends that it has shown the absence of any civil purposes, because the report of the special committee shows only $12,000 in questionable expenditures, while in the years in question it paid $57.50 million in federal income taxes.

From the de minimus nature of the possible civil liability for additional taxes it would have the trial court conclude that only criminal prosecution, not tax liability, was the IRS institutional posture. The trial court declined to draw that inference, observing that while the report of the special committee discussed only $12,000 in questionable expenditures, the IRS was entitled to make its own evaluation of the utility of a more thorough inquiry. Certainly, the special committee's report was in the institutional view of IRS no less self-serving than Amerada's original tax returns.

Thus, we conclude that the taxpayer failed to meet the burden of overcoming the presumption of validity attaching to these two pre-recommendation subpoenas. That conclusion disposes of the challenge to the summonses seeking the company documents listed in footnote 1, *supra*. Amerada does not contend that any privilege or work product rule applies to them.

### IV. *Claims of Privilege*

The first summons, however, calling for the list of persons interviewed by Milbank on behalf of the special committee, is resisted on privilege and work product rule grounds to which we now turn.

### A. *Attorney-Client Privilege*

As noted above, Mr. Oresman's testimony established that Milbank prepared a report for the special committee. The IRS does not seek that report. Annexed to it, however, was a list of the Amerada employees who were interviewed by Milbank. Amerada contends that the annexed list was an integral part of a communication from its attorney giving it legal advice. The trial court rejected that contention on two grounds. It ruled: that the attorney-client privilege was inapplicable to communications from the attorney to the client; and that the list was, in any event, not a privileged communication. While we disagree with the trial court on the first ground, we conclude that it was correct on the second.

■ Although the full report from Milbank to the special committee is not before us, the record suggests that it was in the

nature of legal advice or opinion to persons in Amerada's management authorized to seek and act upon such advice or opinion. Legal advice or opinion from an attorney to his client, individual or corporate, has consistently been held by the federal courts to be within the protection of the attorney-client privilege. *Mead Data Central, Inc. v. U. S. Dept. of Air Force*, 184 U.S.App.D.C. 350, 362 n. 25, 566 F.2d 242, 254 n. 25 (D.C. Cir. 1977); *Garner v. Wolfinbarger*, 430 F.2d 1093, 1096 n. 7 (5th Cir. 1970), *cert. den. sub nom., Garner v. First Amer. Life Ins. Co.*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971); *Schwimmer v. United States*, 232 F.2d 855, 863 (8th Cir.), *cert. denied*, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956); *8 in 1 Pet. Products, Inc. v. Swift & Co.*, 218 F.Supp. 253 (S.D.N.Y.1963); *Georgia-Pacific Plywood Co. v. United States Plywood Corp.*, 18 F.R.D. 463, 464 (S.D.N.Y.1956). Two reasons have been advanced in support of the two-way application of the privilege. The first is the necessity of preventing the use of an attorney's advice to support inferences as to the content of confidential communications by the client to the attorney. 8 Wigmore on Evidence § 2320 (McNaughton Rev. 1961). The second is that, independent of the content of any client communication, legal advice given to the client should remain confidential. *See United States v. Bartone*, 400 F.2d 459, 461 (6th Cir. 1978), *cert. denied*, 393 U.S. 1027, 89 S.Ct. 631, 21 L.Ed.2d 571 (1979). To the extent that the trial court predicated its ruling on the general inapplicability of the privilege to communications from the attorney to the client we disapprove of it.

■ We agree, however, with the court's alternative holding with respect to the list of interviewees. Neither of the usually advanced reasons for the application of the privilege applies to that list. Certainly the list, itself, is not legal advice, and Amerada does not so contend. It does urge, however, that the list can support an inference as to the contents of a confidential communication from Amerada to the attorney. That

argument is foreclosed by our recent decision in *In re Grand Jury Investigation (Sun Company, Inc.)*, 599 F.2d 1224 (3d Cir. 1979). In that case we adopted for this circuit Judge Kirkpatrick's control group test as to what communications by corporate officers to corporate counsel are covered by the attorney-client privilege. Applying that test to questionnaires and memoranda compiled by a law firm in the course of an investigation into possible illegal payments made by Sun's employees in connection with its foreign operations, we held that because the interviewed employees were not members of the relevant control group the contents of their communications to counsel were not protected by the attorney-client privilege. 599 F.2d at 1237. In so ruling, Chief Judge Seitz, for the court, relied upon *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947), which held that the results of an attorney's investigation in preparation for litigation, and in particular, the results of his interviews with employee witnesses, were protected only by the qualified work product rule, not by the absolute attorney-client privilege. Obviously, both in *Hickman v. Taylor* and in *Sun Company, Inc.* disclosure of the witness' statements necessarily disclosed that someone in sufficient authority to deal with the attorney had informed him which employees might have knowledge of relevant facts. The list itself gives no clue as to what anyone in the Amerada control group told Milbank about any potential witness. A rule permitting disclosure of the statements, but preventing disclosure of the list of potential witnesses, would advance none of the purposes of the attorney-client privilege. Indeed, the client could be asked in an appropriate proceeding to disclose the names of all persons who might have relevant information. Such an inquiry could not be foreclosed by the stratagem of making up such a list beforehand and furnishing it to the attorney. Amerada responds that an IRS summons for documents cannot compel a taxpayer to create a new document in response to that summons.

While that may be so,[3] it really doesn't enlighten on the subject of privilege. There is an extant list, and that list contains no information that can be maintained in confidence. Amerada employees could be summonsed pursuant to section 7602(2), 26 U.S.C. § 7602(2) (1976), to give testimony under oath. The suggestion that the court should have denied enforcement of the summons for the list, and relegated IRS to a summons for testimony in which the same names must be disclosed is entirely too formalistic to be taken seriously. The trial court did not err in holding that the list was not the kind of communication protected by the attorney-client privilege.

## B. *Work Product*

■ Amerada also resisted production of the list attached to its report to the special committee as protected work product. The government urged that the work product protection of *Hickman v. Taylor* was solely a limitation on pretrial discovery, not a qualified evidentiary privilege, and that it was, therefore, wholly inapplicable to IRS summons enforcement proceedings. There is a split of circuit court authority on whether the work product rule applies to IRS investigations. *See United States v. Nobles*, 422 U.S. 225, 247 n. 6, 95 S.Ct. 2160, 2167 n. 6, 45 L.Ed.2d 141 (1975). *Compare United States v. Upjohn Co.*, 600 F.2d 1223 (6th Cir. 1979) (work product doctrine is not applicable to section 7602 summonses); *and United States v. McKay*, 372 F.2d 174, 176 (5th Cir. 1967) (Maris, J., application of work product rule to IRS summons proceedings doubted), *with United States v. Brown*, 478 F.2d 1038, 1040–41 (7th Cir. 1973) (work product applies to section 7602 summons). This court has not previously passed upon the question, but the trial court assumed that we would agree with the holding in *United States v. Brown* that the rule applied. Although we have not answered the question of applicability of the work product rule to section 7602 cases, *Sun Compa-* ny, Inc., 599 F.2d 1224, is so closely analogous that it must be deemed controlling. In that case we held that work product protection could be claimed in a grand jury investigation. The government's argument for its inapplicability to IRS summons proceedings is predicated upon the inquisitorial, rather than adversarial, nature of those proceedings. Grand jury investigations are equally inquisitorial, and the interest of the federal government in discovering instances of violations of the criminal law is at least as great as its interest in discovering amounts due to it under the Internal Revenue Code. It would be quite anomalous to hold that the work product rule applied to a grand jury inquisition, but not to an IRS section 7602 inquisition. We hold, therefore, that work product protection can be asserted in resisting enforcement of an IRS summons.

■ *Sun Company, Inc.*, 599 F.2d 1224, also enlightens on the application of the work product rule to the summonsed list. Indisputably, the Milbank report qualifies as material prepared or collected in anticipation of possible litigation. 599 F.2d at 1228–29. Indisputably, also, the protection is qualified, and demands a particularized determination with respect to each piece of information sought. 599 F.2d at 1230–31, 1232–33. Thus, neither the fact that the list was compiled by Milbank, nor the fact that it was attached to a report prepared in anticipation of possible litigation is dispositive. Rather, application of the rule depends upon the nature of the document, the extent to which it may directly or indirectly reveal the attorney's mental processes, the likely reliability of its reflection of witness' statements, the degree of danger that it will convert the attorney from advocate to witness, and the degree of availability of the information from other sources. 599 F.2d at 1231.

■ In this case the list of interviewees is just that, a list. It does not directly or

---

**3.** *See United States v. Brown*, 536 F.2d 117 (6th Cir. 1976). *But see United States v. Rosinsky*, 547 F.2d 249 (4th Cir. 1977). The question is pending before the Supreme Court in *United* States v. Euge, 441 U.S. 942, 99 S.Ct. 2159, 60 L.Ed.2d 1044 (1979), on certiorari from the en banc decision of the Eighth Circuit in *United States v. Euge*, 587 F.2d 25 (8th Cir. 1978).

indirectly reveal the mental processes of the Milbank attorneys. It furnishes no information as to the content of any statement. There is no realistic possibility that its production will convert any member of the Milbank firm from advocate to witness. None of the policy reasons for protection of work product, other than the fact of its initial compilation by Milbank, applies. It is true, as we point out in the discussion of the attorney-client privilege, that the IRS could compile its own list by taking witness testimony. Possibly it could compile a similar list as a result of field work. Thus the need for production of the list is not as compelling as was the need in *Sun Company, Inc.* for the production of the statement of a deceased Sun employee. But as Chief Judge Seitz in that case makes clear, application of the qualified work product protection involves a balancing of competing considerations. Where, as here, the work product in question is of rather minimal substantive content, and presents none of the classic dangers to which the *Hickman v. Taylor* rule is addressed, the government's showing of need can be comparatively lower. Avoidance of the time and effort involved in compiling a similar list from other sources is, in this case, a sufficient showing of need. The district court did not err in concluding that, while the work product rule applied in IRS summons enforcement cases, and the list was work product, the qualified protection in this instance yielded to the IRS's need to get on with its investigation.

### V. *Conclusion*

The order appealed from, directing Amerada to comply with two IRS summonses served on it on January 12, 1978, will be affirmed in all respects.