**In the Matter of Grand Jury Empanelled October 18, 1979.**

**Appeal of Edwin J. HUGHES and Alfred C. DeCotiis.**

**No. 80–1356.**

United States Court of Appeals, Third Circuit.

Argued May 20, 1980.

Decided June 30, 1980.

As Amended Oct. 8, 1980.

John J. Barry (argued), Frohling, Fitzpatrick & Barry, Newark, N.J., for appellants.

Robert J. DelTufo, U.S. Atty., Mark J. Malone, Asst. U.S. Atty. (argued), Newark, N.J., for appellee.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

These appeals present questions of some delicacy concerning the extent to which, by resort to a grand jury subpoena, the federal government may intrude upon the efforts of defense counsel in their preparation for the representation of potential criminal defendants. The subpoena duces tecum which gave rise to the orders appealed from was addressed to Edwin J. Hughes, a licensed private investigator. It directed Hughes:

> to testify before the Grand Jury and bring with [him] all records concerning all investigative endeavors in Port Newark and Port Elizabeth; including original contracts for investigative work, original reports of interviews, original reports of investigative efforts, billing records, checks, receipts, expense account statements, investigative notes and memoranda.

At the time the subpoena was served Hughes was retained by Alfred C. DeCotiis,

Esq., a member of the New Jersey bar, to assist DeCotiis in defending a client who, the government concedes, is a target of a grand jury investigation, the geographic focus of which is the Port Newark-Port Elizabeth area. DeCotiis promptly moved on behalf of Hughes for an order quashing the subpoena. He also moved to intervene in the district court proceedings in order to raise "all claims that can be raised by myself as an attorney and by my client, including specifically, all claims based on either the attorney-client or the attorney work-product privileges." [1] Both Hughes and DeCotiis filed affidavits in support of these motions, which are uncontradicted. The United States filed two affidavits in opposition: one was disclosed to Hughes and DeCotiis; the other was considered by the court *in camera* and sealed. After argument the trial court ruled orally: (1) that the sealed affidavit would not be disclosed; (2) that Hughes' motion to quash the subpoena would be denied; (3) that the court would pass on the assertion of any attorney-client privilege or work-product claim only with respect to specific questions addressed to Hughes; (4) that Hughes must appear and answer seventeen specific questions which, the parties stipulated, would be asked; [2] and (5) that DeCotiis would not be permitted to intervene. Subsequently, Hughes appeared before the grand jury.

1. The attorney-client privilege, while asserted in the trial court, is not an issue on appeal, since the trial court made no order which required disclosure of communications between DeCotiis and his client.

2. The seventeen questions were:
 1. State your name.
 2. What is your address?
 3. What is your occupation?
 4. For how long have you had this occupation?
 5. What are your duties in your job?
 6. In the past six months did you meet and talk with any individuals who operate lunch trucks in the Port Elizabeth, Port Newark area?
 7. In the past six months did you meet and talk with any individuals who own lunch trucks in the Port Elizabeth, Port Newark area?
 8. Please tell us the names and addresses of these lunch wagon owners and operators with whom you have had discussions?
 9. Did you conduct a surveillance of any of these people?
 10. Did you follow any of these people while they were driving their cars?
 11. Do you own a car?
 12. What kind of car is it?
 13. Did you take photographs of any of these people?
 14. Did you take photographs of any of these peoples' residences?
 15. Were you with a third person when you had your discussions with lunch wagon operators? Identify the third person if any?
 16. How did you introduce yourself when you met with lunch wagon owners and operators?
 17. Did you present to any lunch wagon owner or operator that you were acting on behalf of any government agency?

As he had previously represented, he refused to answer all but three of the government's questions, asserting the attorney-client privilege and work product protection. The trial court then entered an order holding Hughes in civil contempt. Hughes and DeCotiis appeal the district court's orders. We affirm in part and reverse in part.

## I. DeCotiis' Motion to Intervene

In support of his motion to intervene DeCotiis filed two affidavits. These affidavits represented: that Hughes was an investigator retained by DeCotiis to assist in the defense of a grand jury target; that the testimony sought related to Hughes' investigative efforts on behalf of that target; that the subpoena amounted to "an improper attempt to utilize the grand jury to discover work product"; and that the subpoena demanded production of records of all investigative endeavors, reports of interviews, investigative notes, and the retainer agreement with Hughes. These documents, it was contended, reflected protected work product. When the motion to intervene was argued the government stated that it was withdrawing the bulk of the subpoena for documents. It still sought, however, Hughes' testimony, without restrictions, and a list of the persons interviewed. The Assistant United States Attorney took the position that he should be free to ask Hughes, before the grand jury, any relevant questions. He contended that Hughes might, or might not, assert a claim of privilege and that if he did the court could rule on each question at that time. DeCotiis' attorney pointed out that the court was dealing with a witness protecting a privilege belonging to someone other than himself. The court, nevertheless, denied the motion to intervene.

While the court's initial order directing Hughes to appear and testify was limited to the production of a list of witnesses interviewed and seventeen specific questions, it was the government's position that the subpoena remained operative and that the grand jury could ask Hughes any question it deemed relevant. The trial court stated that it would not rule in advance on any additional questions, but would await an assertion by the witness of a claim of privilege. No provision was made for participation by Mr. DeCotiis in the questioning before the grand jury. Thus, DeCotiis was forced to rely upon Hughes' ability to recognize questions directed at discovery of what might be protected work product, Hughes' willingness to assert that claim on DeCotiis' behalf, and Hughes' further willingness to stand in contempt should the court overrule the claim of privilege.

 Our consideration of the propriety of the trial court's intervention ruling commences with the observation that the work product doctrine applies to criminal, as well as civil, litigation. *United States v. Nobles*, 422 U.S. 225, 236, 95 S.Ct. 2160, 2169, 45 L.Ed.2d 141 (1975). Moreover, as the Court in *Nobles* observed:

> [T]he doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*Id.* at 238–39, 95 S.Ct. at 2170. (footnote omitted). Nor is it significant that DeCotiis' client has not yet been indicted, for we have held that the doctrine applies to material prepared or collected in advance of litigation. *In re Grand Jury Investigation (Sun Company, Inc.)*, 599 F.2d 1224, 1229 (3d Cir. 1979). It is not disputed that DeCotiis represents a grand jury target likely to be indicted. The likelihood of litigation, therefore, is at least as strong as in *Sun Company, Inc.* DeCotiis properly asserted the protection of the work product doctrine, both on his own behalf, and on behalf of his client. *In re Grand Jury Proceedings (FMC I)*, 604 F.2d 798, 801 (3d Cir. 1979). And unlike the situation in *Nobles*, where by proposing to use the testimony of the agent at trial the attorney waived the privilege of

nondisclosure derived from the work product doctrine, in this case DeCotiis has done nothing amounting to a waiver.

■ We are dealing, then, with a valid claim for work product protection of materials sought, not directly from the attorney, whose factual and legal theories and trial strategies might be reflected therein, but from his agent. In *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the attorney was in a position fully to protect the privilege of nondisclosure provided by the work product doctrine by refusing to produce the material sought and standing in contempt. That remedy is unavailable to DeCotiis. If he is denied intervention, and the agent should be disinclined to contest the subpoena, to resist a production order, to stand in contempt, or to pursue an appeal, he runs the risk that the claim of work product protection will be lost. In this case, thus far, Hughes and DeCotiis have made common cause. But it was not at all certain when the trial court ruled on the motion to intervene that they would continue to do so, either with respect to further questioning pursuant to the subpoena, or with respect to an appeal. The governing rule in these circumstances is that the possessor of the claimed privilege or right may intervene to assert it, and may appeal from an order affording it less protection than claimed. *Gravel v. United States*, 408 U.S. 606, 608 n.1, 92 S.Ct. 2614, n.1, 33 L.Ed.2d 583 (1972); *Perlman v. United States*, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1918); *In re Grand Jury (C. Schmidt & Sons)*, 619 F.2d 1022 (3d Cir. 1980); *In re Grand Jury Proceedings (FMC I)*, 604 F.2d at 800–91; *United States v. RMI, Co. (NL Industries)*, 599 F.2d 1183, 1186–87 (3d Cir. 1979); *In re Grand Jury Investigation (Intervenor A)*, 587 F.2d 589, 592 n.3 (3d Cir. 1978); *In re Grand Jury Proceedings (Cianfrani)*, 563 F.2d 577, 580 (3d Cir. 1977); *In the Matter of Grand Jury Impanelled Jan. 21, 1975 (Freedman)*, 541 F.2d 373, 377 n.4 (3d Cir. 1976). Clearly DeCotiis is an applicant claiming "an interest relating to the . . . transaction which is the subject of the [subpoena enforcement] action . . . so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest . . . ." Fed.R.Civ.P. 24(a). There was no justification for denying his motion and exposing him to the risk of third party disinterest. Since we recognize that he should have been granted the right to intervene, we recognize, as well, his right to object to the order appealed from on substantive grounds. Thus, there is no need to differentiate, for purposes of the motion to quash, between DeCotiis' objections to the subpoena and those asserted by Hughes.

## II. The Motion to Quash

### A. The *Schofield* Affidavit

Both appellants urge that the trial court erred in failing to quash the subpoena because when it was resisted the government failed to furnish a legally sufficient *Schofield* affidavit. They have not had an opportunity to review the affidavit which the court examined *in camera*, and they object to the court's reliance on it in satisfaction of the *Schofield* requirements. The affidavit which was disclosed, they urge, is insufficient. That affidavit states:

MARK J. MALONE, of full age, being duly sworn according to law, deposes and says:

1. I am an Assistant United States Attorney for the District of New Jersey.

2. This affidavit is submitted in accordance with the procedure outlined in *In Re Schofield*, 507 F.2d 963 (3d Cir. 1975). I am presently supervising a grand jury investigation in the District of New Jersey concerning alleged violations of Title 18, United States Code, Sections 371 (Conspiracy); 894 (Extortionate Credit Transactions); 912 (False Personation); 1503 (Obstruction of Justice); 1951 (Extortion); and 1961 (RICO), relating to the operation of mobile lunch trucks at Port Newark and Port Elizabeth, New Jersey and the grand jury's investigation thereof. Edwin Hughes has been subpoenaed by the grand jury as a witness in its investigation.

3. It is essential and necessary to the said grand jury investigation that Edwin Hughes furnish the names of lunch wagon operators in the Port Newark and Port Elizabeth, New Jersey areas whom he has interviewed. It is further essential that Mr. Hughes provide information concerning the conduct and circumstances of his interviews of these lunch wagon operators. The information sought from Hughes is: (1) relevant to the grand jury's investigation; (2) properly within the grand jury's jurisdiction; and (3) not sought primarily for another purpose.

In the *Schofield* cases, *In re Grand Jury Proceedings (Schofield I)*, 486 F.2d 85, 93 (3d Cir. 1973) and *In re Grand Jury Proceedings (Schofield II)*, 507 F.2d 963, 964–66 (3d Cir. 1975), we held that when a district court was called upon in a civil action under 28 U.S.C. § 1826(a) (1976) to issue coercive process to compel grand jury testimony, it should require the United States to make a minimum showing by affidavit that the information sought was relevant to an investigation properly within the grand jury's jurisdiction, and that the information was not sought primarily for another purpose. We noted that there were defenses to enforcement of grand jury subpoenas, that the information relevant to such defenses ordinarily rests in the hands of the government, and that unlimited discovery would conflict with the grand jury secrecy provisions of Rule 6(e) of the Federal Rules of Criminal Procedure. Balancing these competing considerations, we held "that the party seeking enforcement of a grand jury subpoena. . . . [must] make some minimum showing of the existence of a proper purpose before it can trigger the enforcement machinery of the judicial branch." *Schofield I*, 486 F.2d at 92. More recently, in *United States v. Oliva*, 611 F.2d 23 (3d Cir. 1979), we held that it is the enforcement proceeding, not the issuance of the subpoena, which gives rise to the obligation to file a *Schofield* affidavit. We noted in *Oliva* that it is the practice of United States Attorneys in this Circuit to furnish a *Schofield* affidavit to any witness who insists upon its production before testifying. A witness, or a third party, who makes a motion to quash is situated, for purposes of the *Schofield* rule, identically with a witness against whom a section 1826(a) enforcement proceeding is commenced. Indeed, as this case illustrates, the usual outcome of an unsuccessful motion to quash will be a section 1826(a) coercive order. Thus the trial court was correct in assuming that a *Schofield* affidavit was required. The Government does not contend otherwise.

■ As to the sufficiency of the affidavit which was disclosed, we note that although it is cryptic it complies literally with *Schofield* by disclosing that the grand jury was conducting an investigation into specific federal crimes, that Hughes may have information relevant to those crimes, and that the information sought from him is not sought primarily for a purpose unconnected with the investigation. Prima facie, on this showing, the subpoena was valid from the standpoint of abuse of process. We postpone to Part II B consideration of whether it sought information protected by the work product doctrine.[3]

■ Hughes and DeCotiis object that the court should not have denied their motions to quash without affording them an opportunity to examine the additional affidavit which was considered *in camera*. They urge that its contents might have impeached the allegations of the disclosed *Schofield* affidavit, or suggested the need for further inquiry into possible grand jury abuse. We have examined the *in camera* affidavit and conclude that insofar as it bears upon prevention of abuse of grand jury process, the rationale underlying the

---

**3.** Hughes and DeCotiis urge that when a grand jury subpoena is served on an attorney or his agent the minimal *Schofield* showing is insufficient, and the government should be required to show compelling necessity. However, the *Schofield* rule is only a threshold requirement intended to prevent abuse of grand jury process. Its contours do not change with the identity of the party served. Identity, while irrelevant for *Schofield* purposes, may, as we demonstrate in Part II B, be relevant for other purposes.

*Schofield* rule, nondisclosure was not an abuse of discretion. As the trial court noted, the *in camera* affidavit contained information about an ongoing grand jury investigation. Revelation of its contents could lead to intimidation or harassment of potential grand jury witnesses who allegedly were victims of crime. Its contents, moreover, in no way impeach the allegations in the disclosed affidavit. Nor does the *in camera* affidavit suggest any possibility of further fruitful inquiry with respect to abuse of the grand jury process. Again, we postpone to Part II B consideration of whether the *in camera* affidavit bears upon the work product protection.

We conclude that, putting aside for the moment the work product claim, the disclosed affidavit satisfied the minimum requirements of the *Schofield* rule. We also conclude that the district court did not abuse its discretion in declining to reveal the contents of the *in camera* affidavit.

### B. The Work Product Claim

DeCotiis' affidavits referred to in Part I established prima facie that Hughes was his agent, that Hughes had been given instructions to conduct an investigation to assist in the preparation for an anticipated criminal trial, that the instructions given to Hughes reflected DeCotiis' trial preparation efforts and strategies, and that the documents subpoenaed included the results of the agent's efforts. Thus, DeCotiis set forth a prima facie claim of protectable work product as defined in *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141. That claim could be overcome only by a showing that some of the material sought was not work product, that it fell within the category of work product materials disclosure of which could nevertheless be compelled, or that there had been a waiver.

The disclosed affidavit, while sufficient for basic *Schofield* purposes, does not respond to DeCotiis' work product claim. It establishes the purpose of the grand jury investigation, and alleges that Hughes has information relevant to that investigation.

Obviously, he has such information, and so does DeCotiis. But a naked allegation of relevance can not compel disclosure of work product. Here the contents of the *in camera* affidavit become critical, for it is only there that the Government responds in any meaningful way to the work product claim. Recognizing that it was sealed for the purpose of maintaining the secrecy of grand jury proceedings mandated by Fed.R. Crim.P. 6(e), we will discuss those contents only to the extent that the same information was revealed in open court, or to the extent that they do not deal with proceedings which have taken place before the grand jury. The critical allegations are the following:

13. The only documentary evidence the grand jury will seek from Hughes is a list containing the names of lunch wagon operators he has interviewed in the course of his investigation. The subpoena originally was issued before the Government knew that Hughes had been hired by counsel for one of the targets. In light of Hughes' employment status, the Government presently does not intend to pursue the production of any other documentary evidence. The Government will seek Hughes' testimony before the grand jury.

14. The purpose of summoning Hughes as a witness before the grand jury is to determine whether he has knowledge of any other lunch wagon operators whose trucks have been burned and whose identities are presently unknown to the grand jury.[4]

We read the second and third sentences of paragraph 13 as concessions that the subpoena as originally drawn sought production of materials which comprised protected work product. The demand was narrowed, therefore, to a list of lunch wagon operators Hughes interviewed on DeCotiis' instruction, and to testimony about "other lunch wagon operators whose trucks may have been burned." To put the reference to lunch wagon operators in context, it is clear

---

4. The affidavit referred to additional testimony from Hughes which, as described, probably would not fall within the work product doctrine.

from representations made in open court that the grand jury investigation deals with alleged extortion from lunch wagon operators in the Port Newark-Port Elizabeth complex. Thus, what the government sought, after reconsideration, was: (1) a list of the persons interviewed; and (2) testimony as to whether any of those interviewed had had their lunch wagons burned. These narrower demands for information, though eliminating a large part of the work product claim, nevertheless, still presented questions about the scope of the nondisclosure privilege. Those questions are, first, whether the information sought is work product, and second, if so, should the qualified privilege yield to a higher necessity. The Government contended in the trial court, and on appeal, that the answer to the first question is negative, while the answer to the second should be affirmative. We disagree.

Focusing on the list of persons interviewed, we think it is plain that such a list was either obtained from DeCotiis or prepared by Hughes as agent for DeCotiis. In either event it would appear to fall within the definition of work product set forth in *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141. The trial court ruled that the list of interviewees was not work product, and that if it were the nondisclosure privilege had been waived by the fact that the interviews had taken place.

The ruling that the list was not work product was predicated on the court's reading of our recent opinion in *United States v. Amerada Hess Corporation*, 619 F.2d 980 (3d Cir. 1980). In *Amerada Hess* we considered a claim that a list of persons interviewed in connection with an internal investigation of possible illegal overseas payments by a corporation constituted work product. We said:

> In this case the list of interviewees is just that, a list. It does not directly or indirectly reveal the mental processes of the Milbank attorneys. It furnishes no information as to the content of any statement. There is no realistic possibility that its production will convert any member of the Milbank firm from advocate to witness. None of the policy reasons for protection of work product, other than the fact of its initial compilation by Milbank, applies. It is true, as we point out in the discussion of the attorney-client privilege, that the IRS could compile its own list by taking witness testimony. Possibly it could compile a similar list as a result of field work. Thus the need for production of the list is not as compelling as was the need in *Sun Company, Inc.* for the production of the statement of a deceased Sun employee. But as Chief Judge Seitz in that case makes clear, application of the qualified work product protection involves a balancing of competing considerations. Where, as here, the work product in question is of rather minimal substantive content, and presents none of the classic dangers to which the *Hickman v. Taylor* rule is addressed, the government's showing of need can be comparatively lower. Avoidance of the time and effort involved in compiling a similar list from other sources is, in this case, a sufficient showing of need.

*Id.* at 987-88.

■ There are significant differences between an Internal Revenue Service summons enforcement proceeding under 26 U.S.C. §§ 7402(b), 7602(a) (1976) and a proceeding for the enforcement of a grand jury subpoena. But while the Internal Revenue Service summons in *Amerada Hess* had a civil purpose, the possibility of criminal sanctions was quite real. The two situations are practically indistinguishable. We agree with the trial court that *Amerada Hess* controls on the question of production of the list, not because it is not work product, but because for the production of a mere list of persons interviewed the government's showing of need to overcome the nondisclosure privilege is comparatively low. In so holding we have no occasion to endorse the trial court's alternative ruling that conducting the interviews constituted a waiver.

The oral testimony sought by the government respecting the results of the interviews—in particular the information about whose lunch wagons were burned—presents a different problem.[5] Here the trial court was faced with the core of the work product of an agent of the attorney, the very substance of the interviewee's statements. Though Hughes would presumably have been speaking from memory, examination into his recollection of the interview might have indirectly revealed his, and DeCotiis', mental processes. Moreover, use of such material could have created not merely the danger, but also the actuality of converting an agent for the attorney into a witness. The agent as witness problem would not have ended with his grand jury testimony, for Hughes could have been called as a witness at trial had some of the interviewees testified for the Government and had Hughes' trial recollection of their statements contrasted with his recollection at the time of his grand jury appearance. Finally, if the government possessed the list of interviewees the actual witnesses were readily available to the grand jury by compulsory process.

The only justification advanced by the government before the district court for probing into the content of the interviews was that Hughes had information about destruction of lunch wagons which the grand jury lacked. It made no showing that the same information could not be obtained easily by resort to alternative sources.

■ Except for the list of interviewees, on the record made in the trial court the government made no showing, even in the *in camera* affidavit to the extent we have discussed it, of the inapplicability of the work product protection, of its waiver, or of any countervailing necessity which would overcome it. When the government chooses to subpoena an agent of an attorney to inquire into his investigative activities, and a valid work product claim is interposed, a motion to quash should be granted unless the government can show that its proposed line of inquiry falls within the good cause exception which our cases have recognized. *United States v. Amerada Hess Corp.*, 619 F.2d at 987–88; *Sun Company, Inc.*, 599 F.2d at 1233. A "general unsubstantiated allegation is [in]sufficient to overcome the protection afforded by the work-product doctrine." *Id.* at 1232.

■ One showing that the government could have made, obviously, is that the agent was engaged in criminal activity. In its brief the government does not explicitly charge that there was such activity, but at oral argument in the district court and on appeal it has suggested that the grand jury was considering possible obstruction of justice. Some of the questions which the court directed that Hughes answer seem to point obliquely toward an inquiry into possible misconduct.[6] It would be intolerable to permit investigators hired by defense counsel to attempt to obstruct justice by influencing or threatening witnesses. It would be equally intolerable to permit such investigators to violate the law by posing as officers or employees of the Government. But we may not presume that attorneys or their agents routinely engage in such activities. The speculative possibility that they might can not justify endangering protected work product by bringing them before a grand jury. Moreover, when the examination of an attorney's agent with respect to the inquiries he has carried out in that capacity is sought on the ground that the agent, or the attorney, may have engaged in misconduct, something more is required to substantiate the reasonableness of the government's assertions than an ex parte affidavit. Potential witnesses are not Government property. Resentment of energetic trial preparation by defense counsel may lead to unfounded suspicion and base-

---

5. Chief Judge Seitz suggests that this matter is not before us. That would be true if we were only reviewing the contempt order. However, the denial of DeCotiis' motion to quash is properly before us in his appeal from the denial of his motion to intervene. It would be an empty formalism to review only the motion to intervene, remand, and review the denial of the motion to quash in a separate appeal.

6. *See* questions 9, 10, 16, and 17 in note 2 *supra*.

less charges. Before the Government can justify interrogation of attorneys, or their agents, with respect to matters which are prima facie work product, on the ground that the work product involved misconduct, it must demonstrate a reasonable basis for such a belief and the opposing attorney must be afforded an opportunity to respond to the government's allegations. Otherwise, the court may be acting, in directing testimony, on no more than groundless suspicion or prosecutorial resentment. Bringing the agent of an attorney before a grand jury to testify concerning his activities is, after all, a rather serious matter.

■ The Government's justification for insisting that in this case its affidavit be kept secret is the provision in Fed.R.Crim.P. 6(e)(2) that a United States Attorney "shall not disclose matters occurring before the grand jury." There are several obvious responses, which we make with full knowledge of the contents of the *in camera* affidavit. The first is that it is not at all necessary to "disclose matters occurring before the grand jury" in order to disclose alleged misconduct elsewhere. The second is that disclosure, otherwise prohibited by Rule 6(e)(2), may be made "when so directed by a court preliminarily to or in connection with a judicial proceeding." Fed.R.Crim.P. 6(e)(3)(C)(i). If the only source of the information about alleged misconduct is grand jury testimony, the court may well conclude that its disclosure, in justification of a possible invasion of protected work product, is warranted. It may also conclude that some form of notice of the nature and source of the charge of misconduct short of disclosure of proceedings before the grand jury can be devised which will be adequate to give the attorney making the work product claim an opportunity to respond before his agent is ordered to testify. No such opportunity was afforded here, and in its absence there was no justification for a blanket denial of the motions to quash the subpoena served on Hughes.

We note, however, that the practical thrust of the trial court's decision lies less in the denial of the motion to quash, than in the direction to Hughes that he furnish the list of interviewees, and that he answer seventeen specific questions. We have already indicated that the list should have been furnished. The seventeen questions are considered below.

### III. The Contempt Order

■ Of the seventeen questions which Hughes was directed to answer he agreed to answer three (numbers 1 through 3). Of the remaining fourteen questions, numbers 6, 7, and 8, required nothing more than production of the list of witnesses interviewed. In some form that list should have been furnished for the reasons discussed above. The remaining questions, numbers 4, 5, and 9 through 17, deal directly with the manner in which Hughes carried out his task as DeCotiis' agent in conducting an investigation. For example, he was asked if in pursuing his investigation he conducted a surveillance or made photographs. Even the question as to the manner in which he introduced himself involved an inquiry into his investigative technique. The same questions as to methods of preparing materials for use in litigation addressed to any attorney would be an invasion of his work product protection. There was no reason, on the record disclosed to DeCotiis, why his agent should have to answer them.

As to the government's good cause contention only question 17 affirmatively suggests misconduct on Hughes' part. That question asks if Hughes represented that he was acting on behalf of any government agency. The others are ambiguous. Possibly they were meant to develop the theme that by surveilling potential witnesses, photographing them, or following their cars, Hughes was attempting to intimidate them. But because Hughes and DeCotiis were given no information which would warrant such a suspicion, they were justified in asserting that the questions were nothing more than an inquiry into the methods by which Hughes collected work product. Thus, on this record, as to most of the fourteen disputed questions, resistance was appropriate, and a coercive contempt citation improper.

Since the trial court ordered blanket compliance, and in holding Hughes in contempt

did not differentiate among the questions, we are faced with two difficulties. First, we do not know whether, had the court limited its coercive order to the names of interviewees, DeCotiis would have directed compliance. Second, we do not know whether, had the trial court considered the questions separately, it would have held Hughes in contempt with respect to all of them. In these circumstances, we deem it appropriate to vacate the order holding Hughes in contempt and to remand for reconsideration of that order in light of this opinion.

### IV. Conclusion

The order denying DeCotiis' motion to intervene will be reversed. The order denying the motion to quash will be reversed, except insofar as it requires production of a list of persons interviewed, without prejudice to its reconsideration with respect to any new subpoena to Hughes which the government may choose to issue, and any additional showing of a need to compel his testimony. The order holding Hughes in contempt will be vacated and the contempt citation remanded for reconsideration in light of this opinion.

SEITZ, Chief Judge, concurring.

I join Parts I, II A, and IV of the opinion of the court and that portion of Part II B concerning the list of persons interviewed by Hughes.

The contempt citation in this case was based solely on Hughes' failure to produce a list of persons he had interviewed and his refusal to answer seventeen specified questions. The government has not yet asked Hughes any questions about the content of his interviews, and the district court necessarily has not yet ruled on whether any such questions would seek work product or whether the government has shown good cause to compel disclosure of such information. Given this record, I see no need to reach these issues. Accordingly, I express

no view as to that section of Part II B of Judge Gibbons' opinion discussing whether the results of Hughes' interviews are work product or how the government might show good cause to compel disclosure if Hughes was engaged in criminal activity.

As to the seventeen questions addressed in Part III of the opinion of the court, while the issue is not free from doubt, I agree that questions 4, 5, and 9 through 17 seek work product. Because I also agree that the government has failed, on this record, to show good cause to compel answers to all of these questions, I join in the result reached by Judge Gibbons in Part III.

ROSENN, Circuit Judge, concurring and dissenting.

I agree with the majority that DeCotiis' motion to intervene should have been granted[1] and that the *Schofield* affidavit requirement was met. *See* Maj. Op., Parts I & II. I also join in that portion of Part II B which holds that the Government has made a sufficient showing to require Hughes to produce the list of lunch wagon operators he interviewed. For the reasons stated by Chief Judge Seitz, however, I agree that the portion of Part II B of Judge Gibbons' opinion which discusses whether the results of Hughes' interviews are work product and how the Government might show good cause to compel disclosure of those results is unnecessary in the circumstances of the case before us. Accordingly, I decline to join in that portion of Judge Gibbons' opinion. Furthermore, I dissent from Part III of the majority opinion which sustains Hughes' assertion of work product privilege as to those questions which deal with the manner of his investigation. Necessarily, then, I cannot join in Part IV of the majority opinion, reversing the district court's denial of the motion to quash and vacating its order holding Hughes in contempt.

I disagree with the majority's conclusion that the Government's questions concerning the manner in which the interviews were

---

1. I believe, however, that the district court's error in denying DeCotiis' motion to intervene was harmless. At least in the circumstances of this case I believe that Hughes has adequately

protected the work product privilege of DeCotiis. The majority apparently agrees, choosing to base its reversal of the district court upon other grounds.

conducted sought protected work product and that the Government failed to carry its burden to show sufficient "need to overcome the nondisclosure privilege."[2] First, the questions as to the manner in which the interviews were conducted are apparently concerned with whether there was misrepresentation to or intimidation of the persons interviewed. Questions 9 through 14 pertain to surveillance of the interviewees and photographing them. Questions 16 and 17 pertain to how Hughes identified himself and whether he represented that he was acting in behalf of a Government agency. None of these questions inquire into the substance of the interviews. Furthermore, Hughes was not asked to disclose the nature of the information he sought nor was he asked to disclose the particulars of the questions he asked in his efforts to obtain that information. Thus, I do not believe they seek protected work product. Second, assuming *arguendo* that they do, I fail to see why more than a minimal showing of need is required in order to overcome the nondisclosure privilege.

The questions indicate that the Government is concerned with a manner of investigation or interrogation by the interviewer which might have an inhibiting effect on witnesses subpoenaed by the grand jury. I believe the Government's showing was sufficient to require disclosure of that information under the *Amerada-Hess* standard. As in *Amerada-Hess*, these questions do not directly or indirectly reveal the mental processes of DeCotiis, Hughes' employer. Nor do they furnish any information as to the content of any statement made by those Hughes interviewed. Thus, I fail to understand why the showing required of the Government as to these questions should be any higher than that required to compel production of the list of those interviewed, a burden which the majority holds the Government has met.

2. I also disagree with the majority's conclusion that questions 4 and 5 seek protected work product. Those questions are:

4. For how long have you had this occupation?

5. What are your duties in your job?

The length of time Hughes has been engaged in his occupation in no way threatens to reveal

Accordingly, I would affirm the order of the district court denying the motion to quash and holding Hughes in contempt.

DeCotiis' mental processes, which is the primary concern of the work product privilege. Although perhaps a somewhat closer issue, the same is true of question 5. Hughes is being asked to describe, in a general way, the functions he performs as an investigator. He is not being asked to reveal DeCotiis' directions to him in this case or in any other matter.