

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-19-1999

# In Re: Grand Jury

Precedential or Non-Precedential:

Docket 98-6415

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"In Re: Grand Jury" (1999). *1999 Decisions*. Paper 70.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/70

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6415

IN RE: THE GRAND JURY EMPANELING
OF THE SPECIAL GRAND JURY

On Appeal from an Order Entered in the
United States District Court For the District of
New Jersey
(Misc. No. 97-389)
District Judge: Honorable William H. Walls

Argued January 26, 1999

Before: SLOVITER, McKEE and RENDELL, Circuit Judges

(Filed March 19, 1999)

        James A. Plaisted (Argued)
        Christopher M. Farella
        Walder, Sondak & Brogan
        Roseland, N.J. 07068
         Attorneys for Appellants

        Faith S. Hochberg
        United States Attorney
        George S. Leone
        Holly K. Kulka (Argued)
        Assistant United States Attorneys
        Newark, N.J. 07102
         Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Three witnesses appeal from the final order of the District Court holding them in civil contempt and ordering them confined for refusing to testify before a grand jury investigating their father. The witnesses justify their refusal to testify on religious grounds and contend that the District Court failed to follow the procedures mandated by the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. SS 2000bb to 2000bb-4. This appears to be the first Court of Appeals decision to consider the application of that Act to a grand jury subpoena.

I.

A federal grand jury is currently sitting in Newark, New Jersey, to investigate various crimes allegedly committed by an Orthodox Jewish Rabbi. Between August and September 1998, the government subpoenaed three of the Rabbi's daughters to testify before the grand jury concerning, inter alia, the roles of the witnesses as employees of their father. By mutual agreement, the return date of the subpoenas was eventually adjourned until October 29, 1998. On October 27, 1998, the District Court issued an order immunizing the witnesses in order to overcome any Fifth Amendment obstacle to their giving testimony. The next day, the witnesses responded by filing a Motion to Quash, which the government opposed by memorandum submitted on the following day. In support of its opposition, the government filed with the court, ex parte and in camera, a Schofield affidavit, see generally In re Grand Jury Proceedings (Schofield I), 486 F.2d 85 (3d Cir. 1973), setting forth the nature of the grand jury proceedings and the government's interest in and need for the witnesses' testimony.

The District Court denied the motion to quash. It also denied the request made on behalf of the witnesses for an evidentiary hearing and for an opportunity to review the

2

government's Schofield affidavit. On October 29, 1998, the court ordered the witnesses to comply with the subpoenas. All three witnesses appeared before the grand jury but refused to testify on the ground that to do so would violate their deeply held religious beliefs. The same day, the District Court held each in contempt and ordered them remanded to the custody of the United States Marshal for the duration of the term of the grand jury. The court stayed its imprisonment order pending an expedited appeal, and the witnesses filed a Notice of Appeal on November 4, 1998. On November 18, 1998, the District Court issued a written opinion describing the earlier proceedings and explaining its oral decisions of October 29, 1998.

The District Court had subject matter jurisdiction under 18 U.S.C. S 3231. This court has jurisdiction to consider the witnesses' appeal under 28 U.S.C. S 1291. We expedited our hearing and consideration.

II.

In 1963, the Supreme Court stated, "[A]ny incidental burden [a statute imposes] on the free exercise of . . . religion may be justified by a `compelling state interest in the regulation of a subject within the State's constitutional power to regulate.' " Sherbert v. Verner, 374 U.S. 398, 403 (1963) (quoting NAACP v. Button, 371 U.S. 415, 438 (1963)). As the Court further explained in Wisconsin v. Yoder, 406 U.S. 205, 220 (1972), "activities of individuals, even when religiously based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare, or the Federal Government in the exercise of its delegated powers." However, the Court noted, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." Id. at 215. We, along with the other courts, interpreted these passages to mean that a statute that imposed an incidental burden on religion would survive First Amendment scrutiny only if it were the least restrictive means of furthering a compelling state interest. See, e.g., United States v. Dickens, 695 F.2d 765, 772 (3d Cir. 1983).

3

The Supreme Court called the validity of this prevalent interpretation of the Free Exercise Clause into significant doubt in Employment Division, Department of Human Resources v. Smith, 494 U.S. 872 (1990). There it held, "[the] right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Id. at 879 (quotation marks and citation omitted).

It is against this background that Congress enacted the Religious Freedom and Restoration Act. In so doing, Congress stated, "laws `neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." 42 U.S.C. S 2000bb(a)(2). It thus attempted "to restore the compelling interest test as set forth in Sherbert v. Verner and Wisconsin v. Yoder." Id. S 2000bb(b)(1) (citations omitted).

Thereafter, in City of Boerne v. Flores, 521 U.S. 507 (1997), the Supreme Court held RFRA unconstitutional as applied to the actions of a local zoning authority, based in part on the Tenth Amendment. Courts have since disagreed over whether RFRA is constitutional as applied to the federal government. See Christians v. Crystal Evangelical Free Church, 141 F.3d 854, 860-61 (8th Cir.), cert. denied, 119 S. Ct. 43 (1998); United States v. Grant, 117 F.3d 788, 792 n.6 (5th Cir. 1997); cf. United States v. Muhammad, 165 F.3d 327, 336-37 (5th Cir. 1999) (declining to consider in the first instance on appeal argument that RFRA protected federal prisoner from involuntary civil commitment for psychiatric treatment). In our recent decision in Adams v. CIR, No. 98-7200, 1999 WL 111126 (3d Cir. March 4, 1999), we noted the issue, but assumed without deciding that RFRA is constitutional as applied to the federal government. Here also, we need not decide whether any part of RFRA survives Flores, because we conclude that the federal government's actions in this case would survive constitutional scrutiny even under the rigorous RFRA standard.

4

III.

RFRA states, in relevant part:

> (a) In general
>
> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
>
> (b) Exception
>
> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person --
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. S 2000bb-1. Thus, once a party has shown that the application of a neutral law substantially burdens his or her religion, the government bears the burden of proving that enforcement of the law is the least restrictive means of advancing a compelling state interest.

The witnesses argue (1) that the District Court failed to properly apply RFRA by underestimating the burden that forcing them to testify will place on their free exercise of religion, (2) that the government failed to prove that its interest in securing their testimony is compelling, and (3) that enforcing the subpoenas is not the least restrictive means of furthering whatever interest the government may have. We consider each issue in turn.

A.

The witnesses contend that their religion, Orthodox Judaism, prohibits them from providing testimony to be used against their father. The prohibition, they explain, stems from the commandment of the Old Testament, "Honor thy father and thy mother." In support, they cite the affirmation of Rabbi Feivel Cohen, the family's Decisor,[1]

_____

1. As the witnesses explain, "A Decisor makes religious rulings on matters of religious significance and these rulings are binding on the observant Orthodox Jew." Appellants' Br. at 5.

which was submitted together with the Motion to Quash, to the effect that it would be "a fundamental sin which cannot be expunged on Yom Kippur (the Day of Atonement)" for the children to "testify[ ] before members of the public in order to provide the prosecutors evidence to be used against their father." App. at 12.

The District Court expressed some skepticism about whether Jewish tenets in general, or the witnesses' religious beliefs in particular, actually prohibit them from testifying before the grand jury. See App. at 60 n.1. For purposes of decision, however, it "accept[ed] the religious beliefs of the witnesses as such." App. at 60.

The witnesses argue on appeal that, in expressing such skepticism, the District Court underestimated the burden that enforcement of the subpoenas will place on the witnesses' practice of their religion.[2] The witnesses contend, "To the extent the district court determined that the weight to be accorded the religious burden was lightened by these factors, it was inappropriate and the judgment below should be vacated." Appellants' Br. at 38. They further note that the District Court improperly described the burden on their religion as "incidental." Appellants' Br. at 36.

The witnesses misapprehend the District Court's use of the term "incidental" in this context. It was used in precisely this manner by the Supreme Court in Smith, where the Court said:

> [I]f prohibiting the exercise of religion (or burdening the activity of printing) is not the object of the tax but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended.

Smith, 494 U.S. at 878.

As to the witnesses' objection to what appears to be the
_____

2. The witnesses argue that the District Court erroneously blamed them for the delays which occurred in scheduling a time for them to appear before the grand jury. We find no evidence in the record that attribution of blame on the issue of delay in any way affected the District Court's decision.

District Court's questioning of the sincerity of their beliefs and its attempt to interpret for itself the strictures of Orthodox Judaism, we note, first, that the government assumed that the witnesses had shown a substantial free exercise burden and, second, that the District Court assumed for purposes of decision both that the witnesses' religious beliefs were sincere and that testifying against their father would violate these beliefs. In light of the court's assumption, the witnesses were not injured by any skepticism the District Court may have expressed.

B.

The witnesses next complain that the government failed to establish a compelling interest in securing their testimony. The District Court found that the government has an interest in "investigating and successfully prosecuting crimes, which invariably includes taking the grand jury testimony of witnesses." App. at 61. Citing Branzburg v. Hayes, 408 U.S. 665, 687–88 (1972), a case in which the Supreme Court refused to recognize under the First Amendment a blanket reporters' privilege to refuse to testify in grand jury proceedings, and the general principle that the "public has a right to every man's evidence . . . particularly . . . [in] grand jury proceedings," id. at 688, the District Court concluded that the government's interest was compelling. It stated, "That the government should investigate suspected criminal wrongdoing is essential and implements its paramount responsibility for the general safety and welfare of all its citizens." App. at 61.

The witnesses contend that, rather than relying on Branzburg in basing its finding of a compelling state interest on the generalized need for criminal investigation, the court should have conducted a more particularized inquiry into the facts and circumstances of this case. They contend that the District Court was required to consider the nature of the investigation and the relationship between that investigation and the testimony sought before deciding whether the government's interest in questioning the witnesses was compelling. They assume that the crime under investigation is a revenue crime, rather than a capital one, and therefore assert that this fact reduces the

7

weight of the government's interest in investigation. The witnesses further contend that the criminal process is more of a burden on religious beliefs than civil or administrative processes because of the "dramatic" nature of the effect. Appellants' Br. at 35. In support they quote the portion of Justice O'Connor's concurrence in Smith, where she wrote, "A neutral criminal law prohibiting conduct that a State may legitimately regulate is, if anything, more burdensome than a neutral civil statute placing legitimate conditions on the award of a state benefit." 494 U.S. at 898-99.

Although the Supreme Court has not considered whether the government's interest in securing testimony pursuant to a grand jury subpoena is compelling, three courts of appeals have considered a similar issue under the law as it existed prior to Smith, and all three concluded that the government's interest in securing the particular evidence sought for the particular purposes alleged in those cases was compelling. See In re Grand Jury Proceedings of John Doe, 842 F.2d 244, 247-48 (10th Cir. 1988); Port v. Heard, 764 F.2d 423, 432-33 (5th Cir. 1985); Smilow v. United States, 465 F.2d 802, 804-05 (2d Cir.), vacated on other grounds, 409 U.S. 944 (1972). These cases remain a useful aid in interpreting RFRA in light of the expressed congressional intent to restore the status of the law before Smith. See Adams, 1999 WL 111126, at *4.

In Smilow, a grand jury was investigating afire-bombing, which killed a young woman. Appellant, a 17-year-old high school student and a suspect in the bombing, refused to answer the grand jury's questions on the grounds that doing so would violate his faith as an observant Jew. The district court held the student in contempt, sentenced him to jail, and committed him to a federal detention center. On appeal, the Court of Appeals for the Second Circuit affirmed, reasoning that the state has a compelling interest "in uncovering evidence of serious crimes of violence." Smilow, 465 F.2d at 804.

In Port, Bernard and Odette Port were summoned before a state grand jury to give testimony about Bernard's natural son, David, the primary suspect in a murder the grand jury was investigating. When the Ports refused to testify, the state court held them in contempt and

8

sentenced them to jail. The Ports filed a petition for writ of habeas corpus in federal court, arguing, inter alia, that, as observant Jews, they had the right under the Free Exercise Clause to refuse to testify against their son. On appeal, the Court of Appeals for the Fifth Circuit rejected the Ports' argument, holding, "in the context of this case, the state's interest in procuring every person's testimony for the thorough investigation of the crime of homicide outweighs the Ports' First Amendment claims." Port, 764 F.2d at 432.

The decision of the Tenth Circuit in Doe presents a situation parallel to the one before us: a 15-year-old Mormon child was given immunity and called to testify against a parent. He declined because "his deeply held religious beliefs" prohibited him from testifying against his mother or other members of his family. The court of appeals decided that the government's "compelling interest in investigating offenses against the criminal laws of the United States" outweighed the witness's free exercise rights. Doe, 842 F.2d at 248. These cases provide ample support for the District Court's decision.

There are cases in which this court has recognized traditional common law testimonial privileges over the government's interest in securing grand jury testimony. See, e.g., In re Grand Jury Investigation, 918 F.2d 374, 384 (3d Cir. 1990) ("Although there are countervailing considerations, we have no doubt that the need for protecting the [priest-penitent] relationship outweighs them."). However, in a recent decision, we refused to recognize a general parent-child testimonial privilege, see In re Grand Jury, 103 F.3d 1140, 1146-56 (3d Cir.), cert. denied sub nom, Roe v. United States, 520 U.S. 1253 (1997), thereby following the overwhelming majority of state and federal courts on that issue.

We need not decide in this case whether the government's interest in investigating and prosecuting crime is always compelling under RFRA because we are convinced that the government's interest in securing the evidence needed to punish the criminal activity alleged here is compelling. The District Court correctly recognized that the duty to prosecute persons who commit serious crimes is part and parcel of the government's "paramount

9

responsibility for the general safety and welfare of all its citizens." App. at 61. Grand jury proceedings play an essential role in the government's ability to fulfill this duty. A review of the Schofield affidavit confirms both that the crimes that this grand jury is investigating are weighty and that these witnesses are likely to possess substantial relevant information. The dissent makes much of the fact that "[t]his is not a situation involving violence or disruption of public safety." Although it is true that this case does not concern crimes of extreme violence, such as those at issue in Port and Smilow, the crimes alleged here, like many white collar crimes, may seriously impact the public welfare. We therefore conclude that enforcing these subpoenas would serve a compelling state interest.

C.

RFRA imposes yet another requirement, i.e., that the government actions, here enforcing the grand jury subpoenas, must be the least restrictive means of serving the government's compelling interest. According to the witnesses, the subpoenas are not a narrowly drawn means to this end. They contend that the government can secure similar evidence from other sources and that, under RFRA, it has an obligation to do so. They insist that other witnesses can provide, and may already have provided, the same or similar evidence. And, they assert that"there are records that establish some of the operative facts." Appellants' Br. at 33.

The government denies that "there were other means of obtaining the information." Appellee's Br. at 26. It further memorialized this denial in a sworn Schofield affidavit explaining the circumstances under investigation and the witnesses' relationship thereto, which affidavit was submitted under seal to the District Court in thefirst instance and to us on appeal. The District Court reviewed the affidavit in camera and found that the government needs the witnesses' testimony "with regard to their employment status . . . [and] the various business interests of the target." App. at 48.

After reviewing the government's submission ourselves, we reach the same conclusion. There is substantial reason

10

to believe that the witnesses possess relevant information necessary for the prosecution of serious crimes. Their role as employees of the target of the investigation suggests that they are uniquely situated to have first-hand knowledge of the target's past business conduct. Moreover, the witnesses have submitted no evidence beyond their own self-serving allegations to contradict that suggestion or to establish that the government can conveniently obtain comparable information from other sources.

The dissent's contentions to the contrary notwithstanding, see Dissenting Op. at 26-27, we do not suggest that the witnesses bore the burden of proving that less restrictive means were available. We merely point out that the evidence of record, which is contained in the government's sworn affidavit and which supports its position, remains uncontradicted. Although the witnesses were denied an evidentiary hearing, they were not denied an opportunity to submit evidence, as the dissent implies. See Dissenting Op. at 26-27. The witnesses were aware that they could submit evidence in the form of affidavits because they did submit an affirmation of Rabbi Feivel Cohen. Nothing prevented them from submitting affidavits concerning the availability of relevant business records or the potential testimony of other witnesses, which their counsel argue exist.

The dissent contends that although we owe at least some deference to the District Court's conclusion, that conclusion was faulty because it relied on the untested affidavit of the prosecution. See Dissenting Opinion at 26. The dissent fails to note, however, that the affidavit was sworn by an Assistant United States Attorney, an officer of the court. Under these circumstances, there is nothing inappropriate about relying on the affidavit. We therefore conclude that, in this case, enforcing the subpoenas is the least restrictive means of advancing the government's compelling interest.3

_____

3. The witnesses rely on In re Grand Jury Proceedings (Greenberg), 11 Fed. R. Evid. Serv. (Callaghan) 579, 1982 U.S. Dist. LEXIS 18355 (D.Conn. 1982), which held that "the grand jury's particular interest in obtaining testimony from [the witness] against her daughter does not outweigh [the witness's] First Amendment interests" in freely exercising

11

IV.

In addition to the substantive arguments discussed above, the witnesses raise several procedural objections to the District Court's determination. They argue that RFRA and pre-Smith precedent required the District Court to hold a hearing regarding the constitutionality and reasonableness of enforcing the subpoenas, and they claim that it was error under RFRA for the District Court to refuse to disclose the government's affidavit.

A.

The witnesses interpret RFRA, and the pre-Smith precedent that it draws on, to mandate an evidentiary hearing whenever a free exercise defense to the enforcement of a grand jury subpoena is raised. They cite language from Justice O'Connor's concurrence in Smith suggesting that "the First Amendment at least requires a case-by-case determination . . . , sensitive to the facts of each particular claim," 494 U.S. at 899, as well as a passage from Justice Blackmun's dissent in which he states: "[T]his court's prior decisions have not allowed a government to rely on mere speculation about potential harms, but have demanded evidentiary support for a refusal to allow a religious exception." 494 U.S. at 911.

There is a difference between requiring evidentiary support and requiring a hearing. Neither Supreme Court precedent nor our prior decisions require that a hearing be held whenever a subpoena is challenged on reasonableness grounds. Indeed, this court has specifically rejected any such suggestion, leaving the decision to hold a hearing to

_____

her religion. Id. at 584, 1982 U.S. Dist. LEXIS at *11. As a district court
decision, this does not have the broader precedential value of an opinion by a court of appeals. Moreover, in addition to the differences in the factual situations (such as that the grand jury in Connecticut had little need for the mother's testimony as the daughter was not the target in that proceeding), the court acknowledged that "[i]n general . . . the interest of the grand jury in obtaining testimony must prevail over a witness's First Amendment religious rights." Id. at 583, 1982 U.S. Dist. LEXIS 18355, at *10.

12

the district court's discretion. See In re Grand Jury Matter (District Council 33 Health & Welfare Fund), 770 F.2d 36, 39 (3d Cir. 1985); In re Grand Jury Proceedings (Schofield II), 507 F.2d 963, 966 (3d Cir. 1975). Nor does precedent or policy require a different rule when the challenge is a constitutional one.

In Schofield II, we explained the procedure that a district court must follow when asked to enforce a grand jury subpoena:

> [T]he party seeking enforcement of a grand jury subpoena [must] make some minimal showing by affidavit of the existence of a proper purpose. . . . "[T]he Government [is] required to . . . [show] that each item is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose."
>
> [Although] the burden is generally on the witness to show abuse of the grand jury process, Schofield I requires the government to present affidavits in every case irrespective of whether the witness has challenged the propriety of the subpoena. . . .
>
> [W]here the district court is not satisfied with the affidavits presented by the government, whether because the matters set forth challenge the court's credibility or because the witness has made some colorable challenge to the affidavits, the court can require something more.

507 F.2d at 964–65 (footnote and citation omitted) (quoting Schofield I, 486 F.2d at 93).

We went on to discuss the broad discretion a district court enjoys in exercising this supervisory role:

> The district judge is vested with considerable discretion in determining whether additional proceedings are warranted. Various avenues of inquiry are open to a court which questions the sufficiency of the affidavits, among them discovery, in camera inspection, additional affidavits and a hearing . . . . [W]e emphasize . . . that the decision to require

13

additional investigation is committed to the sound discretion of the court.

Id. at 965. We set forth the factors that should inform a district court's decision whether to order further inquiry into whether the government is abusing the subpoena process:

[T]he court must in deciding that request (for additional proceedings,) weigh the quite limited scope of an inquiry into abuse of the subpoena process, and the potential for delay, against any need for additional information which might cast doubt upon the accuracy of the Government's representations.

Id. (quoting Schofield I, 486 F.2d at 93). We treated "the realization that the grand jury must be given broad investigative powers" as a primary consideration in crafting appropriate procedures and rejected "any holding that would `saddle' a grand jury with minitrials . . . [thereby] imped[ing] its investigative duty." Id. at 966. Finally, we emphasized that our review of a district court's determination would be deferential: "We will not disturb a decision to deny additional review unless we find that the district court's `weighing' was an abuse of discretion." Id. at 965.

The same considerations are applicable here; therefore, similar procedures are appropriate. The District Court had a duty to satisfy itself that the witnesses' testimony was necessary to serve the government's compelling interest without unduly delaying or interfering with the functioning of the grand jury. The government bore responsibility for establishing the propriety of enforcing the subpoenas. We therefore conclude that the submission of a Schofield affidavit was a suitable means for the government to fulfill its obligation. And, we hold that, in deciding whether to order further proceedings, it was appropriate for the District Court to weigh the same factors outlined in Schofield I and Schofield II: the scope of inquiry (here under RFRA), the potential for delay, and "any need for additional information which might cast doubt upon the accuracy of the Government's representations." Schofield II, 507 F.2d at 965; Schofield I, 486 F.2d at 93. Because, weighing these

14

factors in this case, we cannot say it was an abuse of discretion for the District Court not to order further inquiry, we will not disturb its determination.

The dissent misinterprets our statement that "similar procedures are appropriate" to mean that the same substantive standard applies whenever a grand jury subpoena is challenged, whether on abuse of process or First Amendment grounds. Lest there be any confusion, we reiterate: in deciding whether to enforce a grand jury subpoena over a RFRA objection, the district court must satisfy itself that the witness's testimony is necessary to serve a compelling state interest. In its discretion, the district court may permit the government, which bears the burden of proving the existence of a compelling purpose and the unavailability of less restrictive means, to meet that burden through the ex parte in camera submission of a sworn affidavit.

The witnesses argue that, although the procedures set forth above may be appropriate in the context of an abuse of process inquiry, RFRA heightens the need for a hearing. They point to RFRA's requirement of individualized judgments and a balancing of facts and circumstances in every case, and they note that RFRA shifts the burden of proof to the government.

It is true that our past decisions have relied in part on a division of the burdens of proof that does not apply under RFRA. For example, in District Council 33, we upheld the district court's decision to enforce a subpoena without requiring an evidentiary hearing on the grounds that "[g]rand jury proceedings are entitled to `a presumption of regularity' " and that "the party objecting to the enforcement of a grand jury subpoena has the burden of demonstrating some irregularity in those proceedings." 770 F.2d at 40 (quoting Schofield I, 486 F.2d at 92). In doing so, we reaffirmed our previous holding that " `the decision to require additional investigation' beyond the Schofield affidavit, `is committed to the sound discretion of the district court.' " Id. at 39 (quoting Schofield II, 507 F.2d at 965).

Under RFRA, the government, rather than the party challenging the subpoena, bears the burden of proof as to

15

compelling interest and least restrictive means. Nothing in this different distribution of the burdens of proof, however, undercuts our determination that similar procedures are appropriate. The fact that the witnesses did not bear the burden of proof on the issues they sought to explore by a hearing makes it less, not more, likely that they were injured by the District Court's denial of that request. We thus reject the witnesses' claim that an evidentiary hearing is always required under RFRA. Of course, we do not suggest that an evidentiary hearing would never be required when the party subpoenaed claims both a substantial burden on his or her religious beliefs and either the absence of a compelling government interest or the availability of a less restrictive alternative. We merely hold that in this case the District Court, which had the discretion to decide, did not abuse that discretion in rejecting the request.

B.

In addition to seeking an evidentiary hearing, the witnesses' counsel requested a copy of the government's Schofield affidavit, which request the District Court denied. The witnesses challenge that denial on appeal, noting that "[i]n Schofield, the affidavit was not only turned over to the defense, it was replicated in the body of the opinion." Appellants' Br. at 43. They ask this court (without making a formal motion) to "order that [the affidavit] be turned over and permit a supplementary brief by the petitioners to address its application to the merits." Id. at 44. We find no merit to the witnesses' challenge and will deny their request.

We have consistently endorsed the use of in camera proceedings to preserve grand jury secrecy. In re Grand Jury, 103 F.3d at 1145 ("Ex parte in camera hearings have been held proper in order to preserve the ongoing interest in grand jury secrecy."); In the Matter of Grand Jury Empaneled Oct. 18, 1979 (Hughes), 633 F.2d 282, 288 (3d Cir. 1980). This procedure is consistent with Supreme Court precedent. See United States v. R. Enters., Inc., 498 U.S. 292, 302 (1991).

16

Our decision in In re Grand Jury, 103 F.3d 1140 (3d Cir. 1997), resolved a similar issue under similar circumstances. A 16-year-old, asserting a parent-child privilege, moved to quash a grand jury subpoena seeking to elicit her testimony about her father's involvement in an alleged kidnaping. The district court held a hearing and ordered additional briefing "on the issue of whether the daughter's testimony would be material and non-duplicative," and it required the government to"make a substantial showing that this threshold was met." Id. at 1143 & n.6 (citation omitted). The government filed a Schofield affidavit and voluntarily furnished further particulars at an in camera ex parte hearing. Based on these in camera and ex parte submissions, the district court concluded, " `the government's interests in compelling the testimony outweigh the privacy interests asserted by the moving parties' and denied the motion to quash on those grounds." Id. at 1144. We affirmed on appeal, stating:

> [W]e find little merit in the arguments . . . pertaining to the Schofield affidavit and the in camera proceedings before the district court. . . . Ex parte in camera hearings have been held proper in order to preserve the ongoing interest in grand jury secrecy. The secrecy of the grand jury proceedings in the present matter might have been compromised by divulging the specific questions that the government intended to ask during the daughter's testimony. Judicial supervision and interference with grand jury proceedings should always be kept to a minimum. . . . We hold that the district court did not abuse its discretion in hearing the government's proffer in camera and ex parte.

Id. at 1145-46 (citations omitted).

The only relevant difference we can see between In re Grand Jury and this case is that the witnesses there based their claims on the need to protect the parent-child relationship, whereas here the witnesses assert religious beliefs in support of their privilege claims. The question remaining then is whether more protective procedures are mandated when a claim to privilege is based on religious beliefs than when it is based on secular beliefs about the same parent-child relationship.

17

The witnesses argue that more protective procedures are required because they view RFRA as "amending" Federal Rule of Criminal Procedure 6(e) to ease the stringency of grand jury secrecy in order to assure the witnesses a meaningful opportunity to contest the burden on their free exercise of religion. RFRA, however, does not purport to amend the rule of grand jury secrecy. To the extent there is a substantial burden on the witnesses' free exercise of religion, it is created by the grand jury subpoena and not by the maintenance of grand jury secrecy. And, although we have accepted the substantiality of the burden alleged, we have concluded that in light of the government's compelling need and the unavailability of less restrictive alternatives, the subpoenas can be enforced.

V.

For the reasons set forth, we will affirm the order of the District Court holding the witnesses in contempt. In light of the impending expiration of the grand jury, the mandate shall issue forthwith.

18

McKEE, Circuit Judge, dissenting:

I respectfully dissent from the opinion of my colleagues. I do not believe the government satisfied its burden of proving that requiring these witnesses to testify against their father in violation of what we assume to be a devoutly held religious belief is the least restrictive means of furthering the government's purported compelling interest in this investigation. For the reasons that follow, I believe that we should remand to the district court for an ex parte hearing. Following that hearing the district court can determine if disclosure of the affidavit and further proceedings are warranted. It is only after such a probing, fact-specific inquiry that the district court can properly conduct the weighing that is required under RFRA. Absent at least an ex parte hearing, there is no way to insure the compelling nature of the government's inquiry or that there is no less intrusive way to gather the evidence the government is seeking. Forcing these witnesses to testify without requiring such a showing is inconsistent with Congress's attempt "to restore the compelling interest test" to enforce generally applied rules over conflicting religious beliefs. See Maj. Op. at 4.

I.

The majority cites Smilow v. United States, 465 F.2d 802, 804-05 (2d Cir.), vacated on other grounds, 409 U.S. 944 (1972); Port v. Heard, 764 F.2d 423, 432-33 (5th Cir. 1985); and In re Grand Jury Proceedings of John Doe, 842 F.2d 244, 247-48 (10th Cir. 1988), to conclude that "[t]hese cases remain a useful aid in interpreting RFRA in light of the expressed congressional intent to restore the status of the law before Smith." See Maj. Op. at 8. However, I do not think those cases support the majority's analysis.

Although a religious objection was the basis of a challenge to a grand jury subpoena in Smilow, I believe that case argues for, not against, granting a hearing here. The same is true of Port v. Heard. In both cases, grand juries were investigating serious crimes of violence resulting in death. In Port, the grand jury subpoenaed the parents of a suspect in an effort to get them to supply information that

19

could be used to indict their son for murder; in Smilow, the grand jury subpoenaed a 17-year old potential witness in a fatal fire bombing. Both witnesses asserted a privilege against testifying based on their First Amendment freedom of religion.1 Although the Courts of Appeals for the Second and Fifth Circuits ruled against the witnesses, both courts were careful to limit the scope of their holdings to the facts of the particular case. In Port, the court stated:

> We hold that in the context of this case, the states's interest in procuring every person's testimony for the thorough investigation of the crime of homicide outweighs the Ports' First Amendment claims, but only if the state's procurement of the testimony was `the least restrictive means of achieving' that interest.

764 F.2d at 432 (emphasis added). Similarly, the court in Smilow noted "the compelling state interest in this case in uncovering serious crimes of violence." 465 F.2d at 804. Thus, although the language in Smilow, Port, and their progeny provides some basis for the majority's holding, I am concerned that the majority has expanded those cases beyond the point supported by those courts' opinions.

Branzburg v. Hayes, 408 U.S. 665 (1972), is the foundation for many of the cases relied upon by the majority, including Smilow and Port. However, those cases rely upon the language of Branzburg without giving adequate consideration to the facts of that case, or the actual holding of the Supreme Court. In Branzburg, the Court considered the consolidated appeals of several different reporters who had independently been subpoenaed in connection with unrelated grand jury investigations. The various investigations included allegations of drug trafficking, civil unrest, and even Presidential assassination. The reporters argued that the First Amendment guarantee of Free Speech and Free Press implicitly established a qualified privilege against disclosing news sources. The Court summarized the reporters' argument as follows:

_____

1. The parents in Port also asserted a parent-child privilege based on their fundamental right of privacy and the Equal Protection Clause.

20

> Petitioners . . . press First Amendment claims that may be simply put: that to gather news it is often necessary to agree either not to identify the source of information published or to publish only part of the facts revealed, or both; that if the reporter is nevertheless forced to reveal these confidences to a grand jury, the source so identified and other confidential sources of other reporters will be measurably deterred from furnishing publishable information, all to the detriment of the free flow of information protected by the First Amendment. Although the newsmen in these cases do not claim an absolute privilege against official interrogation in all circumstances, they assert that the reporter should not be forced either to appear or to testify before a grand jury or at trial until and unless sufficient grounds are shown for believing that the reporter possesses information relevant to a crime the grand jury is investigating, that the information the reporter has is unavailable from other sources, and that the need for the information is sufficiently compelling to override the claimed invasion of First Amendment interests occasioned by the disclosure.

408 U.S. at 679-80. The Court held that no such privilege exists. In so holding, the Court noted that had it recognized such a conditional privilege, the privilege would require courts to conduct a fact-specific analysis each time a reporter was subpoenaed:

> In each instance where a reporter is subpoenaed to testify, the courts would also be embroiled in preliminary factual and legal determinations with respect to whether the proper predicate had been laid for the reporter's appearance: Is there probable cause to believe a crime has been committed? Is it likely that the reporter has useful information gained in confidence? Could the grand jury obtain the information elsewhere? Is the official interest sufficient to outweigh the claimed privilege?

Branzburg, 408 U.S. at 795. The Court reasoned that Congress was free to determine whether a statutory newsman's privilege is necessary and desirable, id. at 706, but until Congress did so, reporters were not entitled to

21

resist grand jury subpoenas on First Amendment grounds.
The Court stated:

> [a]lthough the powers of the grand jury are not
> unlimited and are subject to the supervision of a judge,
> the longstanding principle that `the public . . . has a
> right to every man's evidence,' except for those persons
> protected by a constitutional, common-law, or
> statutory privilege, is particularly applicable to grand
> jury proceedings.

Id. at 688 (emphasis added).

RFRA creates the privilege absent in Branzburg, and the
cases relying upon it. Thus, Branzburg is of dubious
assistance to our inquiry. In Branzburg, as well as the other
cases where claims of privilege have been struck down
because the law did not recognize the particular privilege,
there was no weighing of interests because there was
nothing to weigh on the witnesses' side of the balance.
Under RFRA's statutory framework, however, Congress
expressly requires the government to prove that it has a
compelling governmental interest and that enforcing a
grand jury subpoena is the least restrictive means for
furthering that interest.[2] Therefore, I do not believe we can
determine whether coercing the testimony in this case
satisfies RFRA's dictates without requiring a hearing to
determine whether the government can meet its burdens.[3]

_____

2. Indeed, in Branzburg, the Supreme Court never applied the fact-
intensive "least restrictive means" test required by RFRA; rather, the
Court merely noted that compelling the testimony in that case "bears a
reasonable relationship to the achievement of the governmental
purpose." Branzburg, 408 U.S. at 700. Thus, Branzburg provides no
guidance for determining whether the fact-specific, statutory "least
restrictive means" test is satisfied.

3. On remand, I would leave it to the district court's discretion to
decide
whether a full evidentiary hearing after disclosure of the Schofield
affidavit is required, or whether the ex parte hearing will suffice. The
ex
parte hearing would involve probing into the nature of the alleged crime
and the precise conduct alleged to be criminal, the specific testimony
sought from the witnesses, whether other witnesses exist, and if so, who
they are and what they will likely testify to, whether the government has
already interviewed other witnesses, and if so, the nature of their

22

The Court in Branzburg did state, in dicta, that "[t]he requirement of those cases which hold that a State's interest must be compelling or paramount to justify even an indirect burden on First Amendment rights, are also met here." 408 U.S. at 700 (internal quotation marks and citations omitted). The Court then explained:

> If the test is that the government `convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest,' it is quite apparent . . . that the State has the necessary interest in extirpating the traffic in illegal drugs, in forestalling assassination attempts on the President, and in preventing the community from being disrupted by violent disorders endangering both persons and property. . .

Id. at 701. That is not our case. The violent nature of the crimes being investigated in Branzburg was an important factor in the Court's conclusion; thus, to the extent that the Court's mention of the "compelling interest test" provides precedent for our analysis at all, neither the district court nor the majority opinion gives adequate consideration to the nature of the charges here.

_____

testimony, whether documentary evidence might exist and whether it will corroborate witness testimony, whether the government can obtain personal financial statements of the three children, and any other facts that may shed light on the government's need for the testimony.

With respect to disclosure of the Schofield affidavit, I believe the district court should also weigh the government's interest in secrecy in this particular case against the witnesses' substantial interests in arguing their position. At oral argument, the government asserted that it opposed disclosure of the Schofield affidavit in this case because such disclosure could result in the fabrication of testimony or evidence. That is, of course, a risk in any prosecution involving the testimony of witnesses, and there are sanctions for such conduct including prosecution for perjury. Thus, I fail to see how the government's concern for perjury outweighs the witnesses' substantial interest in reviewing the affidavit to determine whether some alternative, less restrictive means for
furthering the governmental interest exists. Nevertheless, here, I would leave the disclosure decision up to the district court following an ex parte
hearing.

Smilow and Port only highlight the distinctions between Branzburg and this case. See Maj. Op. at 8-9. In Smilow, the witness resisting a grand jury subpoena in a fatal fire bombing investigation claimed that he was an " `observant and committed Jew' [and therefore] must refuse to answer the grand jury questions or else suffer `Divine punishment and ostracism from the Jewish Community' as an `informer.' " 465 F.2d at 804. However, the privilege that he asserted was not recognized under law at the time. 4 The court noted: "The legal claim is apparently a novel one and its precise religious basis is not clear from the record before us." Id. The court then relied in part upon Branzburg to find a compelling state interest that overcame the religious objection. The court stated: "[W]e do not believe that appellant's right to refuse to answer highly relevant questions is any greater than those claimed by petitioners in Branzburg, in the face of the compelling state interest in this case in uncovering evidence of serious crimes of violence." Id.

The courts in Smilow and Port also relied largely on the fact that the crimes being investigated by the grand jury involved extreme violence. The court in Smilow explained: "we believe that appellant's first amendment claim is outweighed by the compelling state interest in having the grand jury hear `every man's evidence' bearing on alleged criminal activity that resulted in the death of an innocent person." 465 F.2d at 805 (citing Branzburg) (emphasis added). Similarly, in Port, the court repeatedly recognized the need for a complete investigation because the underlying crime involved a murder. See, e.g., 764 F.2d at 432 ("in the context of this case, the state's interest in procuring every person's testimony for the thorough investigation of the crime of homicide outweighs the Ports' First Amendment claims"); id. at 433 ("First Amendment interests may be subjugated to [the state's interest in

_____

4. Similarly, when Port was decided no parent-child privilege was recognized under the First Amendment, the Equal Protection Clause, or the fundamental right to privacy. Texas had recognized a marital privilege, but not a parental privilege. The court held that "[t]he right to refuse to testify against one's child is not a fundamental right. Nor does the distinction between the marital and parental privileges involve a suspect class." 764 F.2d at 431.

24

discovering the truth about a crime] in the proper circumstances" and holding that pursuing investigation of a murder presents proper circumstances) (emphasis added).

Given the nonviolent nature of the crimes being investigated here, I am far more reluctant than my colleagues to rely on precedent where the courts were obviously influenced by the violent nature of the crimes being investigated.

II.

Absent an ex parte hearing at the very least, I remain unconvinced that the underlying crimes here justify a rule elevating the government's claimed compelling interest over the religious rights of these witnesses. This is not to say that the crimes being investigated are not serious, or that they are not worthy of prosecution. Rather, I submit that the nature of the investigation here has not been properly placed on the RFRA scale. Indeed, it does not appear to have been considered at all. This is not a situation involving violence or disruption or a threat to public safety. Indeed, it does not even appear that the alleged crimes are continuing. Rather, it is an investigation into past conduct. The majority asserts that "[t]he District Court correctly recognized that the duty to prosecute persons who commit serious crimes is part and parcel of the government's `paramount responsibility for the general safety and welfare of all its citizens.' " See Maj. Op. at 9-10. But the record simply does not establish that the "general safety and welfare" of the citizenry is implicated here.

Moreover, I do not believe that the deference we owe to the district court's conclusion justifies upholding the deference it showed to the untested affidavit of the prosecution, as opposed to taking adequate steps to protect the religious rights asserted by the witnesses and protected under RFRA. The majority states, "the witnesses have submitted no evidence beyond their own self-serving allegations to contradict [the suggestion that, as employees, they are uniquely situated to have first hand knowledge] or to establish that the government can conveniently obtain comparable information from other sources." Maj. Op. at

25

11. However, the witnesses do not dispute that they may possess relevant information; nor do they deny (or confirm) that they were employees of the target (although it is unclear why that makes them "uniquely situated" compared to other employees). Instead, the witnesses argue that the government has failed to establish that similarly probative information cannot be obtained elsewhere, either from other witnesses or through documentary evidence, without burdening their religious beliefs.

In addition, the majority's approach shifts the government's burden under RFRA to the witnesses. This is exacerbated by the "Catch 22" in which the witnesses are ensnared. They have made only bare and unsupported assertions because they have been denied a hearing, and are therefore forced to shoot blindly at an affidavit they have not seen. Yet, the majority partially relies on their inability to assert more than bald allegations to affirm the district court's refusal to grant them a hearing.

The majority's analysis suggests that the procedures routinely used to review grand jury subpoenas under Schofield are necessarily adequate to review RFRA challenges. I can not agree. In Schofield II , we held, "[T]he Government [is] required to . . . [show] that each item is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose." In re Grand Jury Proceedings, 507 F.2d 963, 966 (3rd Cir. 1975). Such an inquiry is totally inadequate to afford the protections Congress intended under RFRA. The usual Schofield affidavit does not establish the compelling nature of the government's interest nor address whether there are alternative means of obtaining the evidence.5 That is not the purpose of the Schofield affidavit; rather, it merely seeks to insure that the subpoena process is not being abused. To the extent we hold that a Schofield inquiry is

_____

5. In fairness to the government, and to its credit, the affidavit that was
submitted here is far more specific than the usual boilerplate that is pasted into a Schofield affidavit. However, the procedure utilized here is inadequate to insuring that the government can satisfy both prongs of RFRA.

26

sufficient under RFRA, we lower the statutory bar Congress has erected. Indeed, we may well eliminate that bar as the Schofield inquiry does not address the compelling need of the prosecutor nor the existence of alternative avenues of investigation at all. Therefore, I disagree with the conclusion that "similar procedures are appropriate." See Maj. Op. at 14. An inquiry along the lines set out in Schofield may be necessary for the government to meet its burden under RFRA, but it is by no means sufficient to do so.

Thus, I fear that our holding today will have the unintended consequence of creating a per se rule that will preclude a court from ever concluding that there is a less restrictive means for obtaining information than actually compelling grand jury testimony. At oral argument before the district court, the district court essentially held that to satisfy its burden in any criminal investigation the government merely has to assert that it has a compelling interest in "pursu[ing] all avenues in the search for the truth in a criminal investigation," app. at 48 (emphasis added), and that there is no practical alternative. We now endorse that low threshold by holding that so long as "[t]here is substantial reason to believe that the witnesses possess relevant information necessary for the prosecution of serious crimes," enforcing the subpoena is the least restrictive means of advancing the government's compelling interest in protecting "the general safety and welfare of all its citizens." See Maj. Op. at 10–11 & 10.

We are told that these witnesses will be forced to commit a grave sin under the tenets of their religion, and we assume that is so. It is a sin for which there is no atonement. Yet, we do not even grant an ex parte hearing to make the government prove that the need for their testimony is sufficiently compelling and the alternatives so nonexistent as to justify this affront to their religion under RFRA. The language of RFRA, and the First Amendment doctrine from which RFRA evolved, require more. See, e.g., Wisconsin v. Yoder, 406 U.S. 205, 235 (1972) ("courts must move with great circumspection in performing the sensitive and delicate task of weighing a State's legitimate social concern when faced with religious claims for exemption

27

from generally applicable [laws]" and noting particularized showing as to the adequacy of the alternatives); Employment Div. Dept. of Human Resources v. Smith, 494 U.S. 872, 899 (1990) (O'Connor, J., concurring) ("Even if, as an empirical matter, a government's criminal laws might usually serve a compelling interest in health, safety, or public order, the First Amendment requires a case-by-case determination of the question, sensitive to the facts of each particular claim. . . .").

Because I believe the government's Schofield affidavit alone does not satisfy those burdens, and the district court's scrutiny was wholly inadequate, I would remand for a more searching examination of the government's need for the testimony in this particular case and a determination of whether alternatives might exist. Accordingly, I respectfully dissent.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

28