

Villanova University Charles Widger School of Law
Villanova University Charles Widger School of Law Digital Repository

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-13-1999

# In Re: Grand Jury

Precedential or Non-Precedential:

Docket 98-6498

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation
"In Re: Grand Jury" (1999). *1999 Decisions.* Paper 120.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/120

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 13, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6498

IN RE: IMPOUNDED

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Docket No. 97-MC-333)
District Court Judge: Honorable John W. Bissell

Argued March 3, 1999

Before: RENDELL, ALDISERT Circuit Judges,
WILLIAMS, District Judge*

(Filed May 13, 1999)

        Jeremy D. Margolis
        Edward E. McNally (ARGUED)
        Robert M. Andalman (ARGUED)
        Altheimer & Gray
        10 South Wacker Drive, Suite 4000
        Chicago, IL 60606

         Attorneys for John Doe 1 and
         John Doe 2

_____

*Honorable Spencer M. Williams, United States Senior District Court
Judge for the Northern District of California, sitting by designation.

James R. Streicker
Terence H. Campbell
Cotsirilos, Stephenson, Tighe &
 Streicker, Ltd.
33 North Dearborn St., Suite 600
Chicago, IL 60602

 Attorneys for John Doe 3

Joel I. Klein,
 Assistant Attorney General
A. Douglas Melamed,
 Deputy Assistant Attorney General
John J. Powers, III
John P. Fonte (ARGUED)
Anthony V. Nanni
Reginald K. Tom
Matthew D. Segal
Antitrust Division
U.S. Department of Justice
1401 H. Street, NW
Washington, DC 20530

 Attorneys for Appellee

OPINION OF THE COURT

RENDELL, Circuit Judge.

This case involves the question of when a fear of foreign prosecution implicates the Fifth Amendment privilege after the Supreme Court's decision in United States v. Balsys, 118 S. Ct. 2218 (1998). Appellants are immunized witnesses who have refused to testify before a grand jury, claiming that their case falls within a test articulated in Balsys requiring Fifth Amendment protection.

On October 29, 1997, a special grand jury was impaneled in the District of New Jersey for the purpose of investigating possible price-fixing or other anticompetitive agreements among manufacturers and distributors in the artificial sausage casings industry that may violate Section 1 of the Sherman Act, 15 U.S.C. S 1. The appellants in this case are

employees of a corporation targeted in this investigation; each of the appellants appeared before the grand jury pursuant to a subpoena and an immunity order of the District Court compelling his testimony. Appellants indicated their willingness to answer questions relating to certain business dealings within the United States, but they refused to answer questions about activities that occurred in the United States and related to foreign markets or occurred outside the United States, claiming that the court's compulsion order and grant of immunity provided insufficient protection against foreign prosecution. When the government moved to hold appellants in contempt, the appellants requested the court to order a hearing at which they could question the government regarding contacts with foreign governments relating to this investigation.

Appellants argued before the District Court, as they do here, that language in the Supreme Court's opinion in United States v. Balsys created a test for when a foreign prosecution implicates a defendant's Fifth Amendment rights, and that this prosecution falls within the "test" of Balsys, because it is an instance of cooperative international antitrust enforcement.[1] They offered evidence of a "standing policy" that included selections from speeches by Antitrust Division officials that discussed increasing "internationalization" of antitrust enforcement, "positive comity" initiatives with other countries that result in information and evidence sharing, and two prior criminal antitrust investigations with the Canadian government. They also pointed to substantive criminal penalties in other countries for antitrust violations, namely, Argentina, Canada, Chile, Ireland, France, Japan, Korea, Norway, Spain, Taiwan, Thailand, and the Philippines, as further evidence of increasing internationalization of antitrust law. They also argue that the policy of internationalization also included the use of Mutual Legal Assistance Treaties ("MLATs") in obtaining information, and also the use of the grand jury in aiding foreign prosecutions, through the International Antitrust Enforcement Assistance Act.

_____

1. The language that all agree is the basis for the "test" is set forth infra
at pages 7-8. It does not lend itself to paraphrasing.

3

In addition, appellants argued to the District Court that a joint international prosecution had occurred in their cases. They pointed to the following as evidence of that joint prosecution: 1) questioning of grand jury witnesses about Canadian and German contacts; 2) efforts by the Antitrust Division in Canada, Spain, the United Kingdom, Germany, Mexico, France, and other nations, to obtain documents for the grand jury investigation; and 3) efforts by the Antitrust Division to question Mexican and German nationals. Appellants also argued that Canadian authorities had contacted one of their counsel, and that this event also constituted evidence of a joint prosecution. As a result, appellants argued they were facing a "whipsaw" in which they could be compelled to produce information in this country, but be prosecuted in foreign nations, and that the Antitrust Division desired to use the witnesses' testimony about foreign effects of their behavior to instigate a foreign prosecution based on the grand jury's investigation.

Appellants also asserted that they required a hearing to question government witnesses, because they had no way of further developing their proof regarding foreign contacts. In response to appellants' arguments, the government disclosed a set of Schofield affidavits and submitted separate in camera Schofield affidavits. The disclosed affidavits stated that the compelled testimony was sought by the United States "to advance the grand jury's inquiry, and not for another purpose" and that testimony was not sought for the purpose of delivering that testimony to a foreign nation.

The appellants claimed that this government proffer was insufficient, because it could be inferred from their evidence that the Antitrust Division had already been sharing information with foreign authorities for the purpose of foreign prosecutions. Based on all of these facts, they argued, due process required that the nature and extent of the relationships between the United States and the foreign countries in this case be explained, and that the evidence they had already produced mandated an evidentiary hearing.

The District Court convened a number of hearings that focused on the nature and extent of appellants' asserted

4

Fifth Amendment rights. At the first hearing, the District Court addressed several of the substantive legal issues raised by appellants and engaged in a waiver colloquy with one of them, who would not be able to attend the later hearing. In the interim, when another appellant refused to testify, the court heard argument on the applicability of United States v. Balsys and entered an initial contempt order; appellants filed a motion for reconsideration, and the court heard further argument, withheld signature on its contempt order, and combined the claims and arguments of the witnesses for briefing and argument. The court then held a final hearing on the import of Balsys to determine whether the appellants should be held in contempt, and whether the appellants' motion to compel witnesses should be granted. In addition to these hearings, the court reviewed the disclosed and in camera Schofield affidavits and questioned prosecutors and the grand jury foreman in camera as to the nature of the dispute.

In its final rulings on the motions, the court credited the efforts of appellants, but noted that it had to focus upon the "well-defined nature of the proceedings that are before the Court at this time. . . . what is the likelihood of disclosure of the evidence to one or more foreign governments at least to the point of requiring a factual inquiry into that subject." In so stating, the court accepted the government's pronouncements, including the assurances made in its Schofield affidavits to the effect that the information to be obtained was only to be used for a prosecution within the United States, found that the appellants had not raised a genuine issue of material fact requiring an evidentiary hearing, and denied appellants' motion to compel. Later in the argument, appellants made a renewed application for an evidentiary hearing and for disclosure of the in camera proceedings and affidavits, claiming that disputed issues had presented themselves in the course of the government's presentation, and that their course of dealings with the government indicated that a hearing was necessary. The court denied the hearing motion once again, finding that the evidence presented by appellants, even if accepted, was "immaterial and inadequate." The court also found that the evidence and argument of appellants did not undermine the

5

government's representations, even those contained in the Schofield affidavits released to counsel, that grand jury evidence was being collected in furtherance of a legitimate inquiry, and that the material was not going to be released to foreign prosecutors. The court also found that the circumstances presented "virtually no likelihood of the generation of a record which would overcome those positions asserted by the government with regard to this testimony from these witnesses." The District Court then moved on to set forth its reading of the Balsys opinion, and it found that Balsys did not provide a basis for appellants' claims of Fifth Amendment privilege. The District Court held the appellants in contempt, and they now appeal to this court.

Appellants now assert: 1) the District Court erred in not accepting their assertions of privilege, and 2) the District Court erred by determining that an evidentiary hearing was not required to determine the merit of their Fifth Amendment claims, and in so doing, denied them their due process rights. We have jurisdiction pursuant to 28 U.S.C. S 1291. Our review of the District Court's legal analysis is plenary. See In re Grand Jury, 103 F.3d 1140, 1143 (3d Cir. 1997). The District Court's decision to deny additional review, beyond that of a Schofield affidavit, is subject to abuse of discretion review. See In re Grand Jury, No. 98–6145, 1999 WL 150880, at *8–*9 (3d Cir. Mar. 19, 1999).

I. Balsys

Appellants recognize that the basis for and scope of their Fifth Amendment privilege was the subject of extensive discussion in United States v. Balsys, 118 S. Ct. 2218 (1998), in which the Supreme Court held that the Fifth Amendment did not apply to foreign prosecutions. In Balsys, the appellant, in a resident alien application, had claimed that he had served in the Lithuanian army between 1934 and 1940, and that he had lived in hiding in Lithuania between 1940 and 1944. See id. at 2221. He was subpoenaed by the Office of Special Investigations of the Justice Department as to his wartime activities via an administrative subpoena. See id. Balsys refused to testify, claiming a Fifth Amendment privilege against compelled self

6

incrimination, because although his answers would not subject him to criminal investigation in the United States, he faced the prospect that his responses to the potential deportation proceeding could subject him to criminal prosecution by Lithuania, Israel, and Germany. See id. at 2221–22. As the government had conceded the reasonableness of Balsys's "real and substantial fear" of prosecution, the Court looked to "whether a criminal prosecution by a foreign government not subject to our constitutional guarantees presents a `criminal case' for purposes of the privilege against self-incrimination." Id. at 2222. After surveying the different historic approaches to the privilege in Supreme Court jurisprudence, the Balsys court concluded that fear of foreign prosecution, without more, was not a sufficient basis for the invocation of a Fifth Amendment privilege against compelled self-incrimination. See id. at 2234–35.

Appellants argue that certain language in the Balsys opinion sets forth a "test" for an exception to the general rule, whereby the Fifth Amendment privilege may be recognized in connection with fear of foreign prosecution. It is true that in Balsys, Justice Souter expounds on circumstances under which a claim of privilege may nonetheless be permissible in light of likely foreign prosecution:

> This is not to say that cooperative conduct between the United States and foreign nations could not develop to a point at which a claim could be made for recognizing fear of foreign prosecution under the Self-Incrimination Clause as traditionally understood. If it could be said that the United States and its allies had enacted substantially similar codes aimed at prosecuting offenses of international character, and if it could be shown that the United States was granting immunity from domestic prosecution for the purpose of obtaining evidence to be delivered to other nations as prosecutors of a crime common to both countries, then an argument could be made that the Fifth Amendment should apply based on fear of foreign prosecution simply because that prosecution was not fairly characterized as distinctly "foreign." The point would

be that the prosecution was as much on behalf of the United States as of the prosecuting nation, so that the division of labor between evidence-gatherer and prosecutor made one nation the agent of the other, rendering fear of foreign prosecution tantamount to fear of a criminal case brought by the Government itself.

Whether such an argument should be sustained may be left at the least for another day, since its premises do not fit this case. It is true that Balsys has shown that the United States has assumed an interest in foreign prosecution, as demonstrated by OSI's mandate and American treaty agreements requiring the Government to give to Lithuania and Israel any evidence provided by Balsys. But this interest does not rise to the level of cooperative prosecution. There is no system of complementary substantive offenses at issue here, and the mere support of one nation for the prosecutorial efforts of another does not transform the prosecution of the one into the prosecution of the other. . . . In this case there is no basis for concluding that the privilege will lose its meaning without a rule precluding compelled testimony when there is a real and substantial risk that such testimony will be used in a criminal prosecution abroad.

118 S. Ct. at 2235-26.

Appellants claim that this language in Balsys sets forth a test for determining whether an individual may claim a Fifth Amendment privilege against self-incrimination based on fear of foreign prosecution, and they articulate the test in their brief as follows: 1) the witness's fear of foreign prosecution is reasonable; 2) the fear is based on a foreign criminal statute substantively similar to United States law; and 3) the testimony is being taken with a purpose that it will be shared with a foreign government. Br. at 34.

Despite appellants' arguments, we remain unconvinced that Balsys necessarily establishes a "test," let alone the test they urge. Nor do we view the Supreme Court's pronouncements as arguably justifying the privilege here given the facts appellants have adduced. First of all, the

8

language in Balsys is conditional rather than prescriptive (i.e., "could be said," "could be argued") and sets forth a hypothetical situation reserved "for another day," rather than a set of rules which a court can readily apply to determine whether an investigation is such that the protections of the Fifth Amendment should apply. Moreover, despite appellants' arguments, we also find that even were we to seize upon the generalized statements in Balsys as a rule, we disagree not only with their characterization of the showing it would require but also with their contention that their allegations are sufficient to bring Balsys into play. They assert the existence of a broad-based policy of international prosecution and spirit of cooperation that reflects an ongoing and established policy of "joint internationalization" of antitrust enforcement by the Justice Department that satisfies the Balsys "test." However, even when we employ Justice Souter's explication in Balsys as our guide, we conclude that instances of contacts with overseas nationals, or requests for documents in foreign countries, in this case, even when combined with the selections of the speeches cited by appellants, are not sufficient to demonstrate a "joint prosecution" in the meaning contemplated by Balsys.

Balsys recognizes that a Fifth Amendment right may possibly exist in a situation in which the prosecutorial actions at issue essentially transform foreign efforts into a domestic prosecution, so that the protections might apply. See 118 S. Ct. at 2230-35. In Balsys, the United States had undertaken an interest in the particular kinds of foreign prosecution to which Balsys was subject through treaty agreements and investigative efforts. See id. at 2235-36. For example, an agreement between the United States and Lithuania provided for cooperation in prosecution of war crimes, mutual legal assistance concerning the prosecution of persons suspected of having committed war crimes, and assistance in locating witnesses and making available witnesses. See id. at n.19. Moreover, in Balsys, the Office of Special Investigation was mandated to act as a liaison with foreign prosecution offices and to use resources for investigations, guidance, information, and analysis, and to direct and coordinate prosecutions. See id. at n.18. Yet, the Court found that this was not sufficient to create a

"cooperative prosecution," as there was "no system of complementary substantive offenses at issue here, and mere support of one nation for the prosecutorial efforts of another does not transform the prosecution of the one into the prosecution of the other." 118 S. Ct. at 2235-36. Appellants have pointed to questioning of witnesses about foreign contacts, efforts to collect documents in other nations, and attempts to question Mexican and German nationals, and the existence of criminal antitrust penalties in other countries as evidence of a "cooperative prosecution." However, we see the matter differently. The fact that a few instances of evidence gathering have occurred in other countries does not create an inferential leap that appellants' fear of foreign prosecution is "tantamount to fear of a criminal case brought by the Government itself." Id. at 2236. In addition, the fact that other nations have enacted criminal antitrust laws does not dictate a conclusion that nations are acting in concert through a system of complementary substantive offenses, particularly where a number of the nations in which appellants claim they face prosecution in fact do not criminalize price fixing, have never had a successful criminal antitrust investigation or have never utilized the criminal antitrust provisions, or enforce antitrust violations through administrative proceedings. The authorities that appellants cite, either in their own particular case or in terms of trends in Antitrust Division policies, may indicate that such a case might present itself to us at some point in the future, but we view appellants' argument as urging a "what if " scenario rather than a true case of an ongoing or imminent international "cooperative prosecution" that would warrant our viewing foreign activity as part of a domestic prosecution.

II. Flanagan

Although appellants rely heavily on Balsys as supporting their position, the government argues that we cannot let the novel issue presented by Balsys overshadow the need for appellants to satisfy the threshold question conceded by the government in Balsys: whether a witness faces a real and substantial fear of foreign prosecution. See 118 S. Ct.

10

at 2221; see also United States v. Balsys, 119 F.3d 122, 124-26 (2d Cir. 1997), reversed, 118 S. Ct. 2218 (1998). We will address this issue because we agree that this is an essential element that was ultimately neither conceded (as in Balsys) nor met in this case, and because the District Court's discussion of this issue reflected an ambivalence as to its meaning. The District Court first found that it was not necessary to rule on the question of the "reasonableness" of the fear of foreign prosecution in the course of its ruling denying an evidentiary hearing to appellants, but then noted that it might revisit the issue as it addressed the merits of the contempt motion. The District Court then made the following statement when appellants' counsel asked whether he should address the question of the "reasonableness" of their fear of foreign prosecution:

> Well, I think, frankly, the prospect of foreign prosecution remains uncertain. On the other hand, I realize that we're dealing with lay people who are businessmen, and if it is a question of essentially determining whether any of them objectively . . . has a reasonable fear foreign prosecution might ensue, then such an apprehension would be understandable.

Appellants claim that these statements constitute afinding by the District Court that a "reasonable" fear of prosecution exists under their version of the Balsys "test." However, we note first that this language is somewhat vague and conditional, and does not necessarily constitute afinding. However, even if we construe this statement as afinding by the District Court, we find that it does not properly address and analyze the question of "real and substantial fear of prosecution" within the meaning of Flanagan, let alone Balsys.

The standard for real and substantial fear of foreign prosecution is set forth in the Second Circuit's decision of In re Flanagan, 691 F.2d 116 (2d Cir. 1982), and has been adopted by this court.2 See Environmental Tectonics v. W.S.

_____

2. Other Courts of Appeal have found that the protections of Fed. R. Crim. P. 6(e) are sufficient in and of themselves to protect against foreign
prosecution, and that no further inquiry is necessary. See In re Grand Jury (Nigro), 705 F.2d 1224, 1227-28 (10th Cir. 1982); In re Baird, 668 F.2d 432, 434 (8th Cir. 1982).

11

Kirkpatrick, Inc., 847 F.2d 1052, 1064-66 (3d Cir. 1988). The Flanagan test involves the following factors: 1) whether there is an existing or potential foreign prosecution of a witness; 2) what foreign charges could be filed against that witness; 3) whether prosecution would be initiated or furthered by testimony; 4) whether any such charges would entitle the foreign jurisdiction to have an individual extradited from the United States; and 5) whether there is a likelihood that any testimony given here would be disclosed to the foreign government. 691 F.2d at 121. The Flanagan court also noted that the apprehension "must be a real and reasonable one, based on objective facts as distinguished from his subjective speculation." 691 F.2d at 121. This threshold showing must be made, because the Fifth Amendment "privilege protects against real dangers, not remote and speculative possibilities." Zicarelli v. New Jersey State Commission of Investigation, 406 U.S. 472, 478 n.2 (1972). Courts have construed these factors narrowly and have rarely found that real and substantial danger of foreign prosecution exists. See United States v. Gecas, 120 F.3d 1419, 1425-26 (11th Cir. 1997), cert. denied, 118 S. Ct. 2365 (1998).

Appellants have not satisfactorily argued, let alone shown, that they face a real and substantial fear of prosecution within the meaning of the Flanagan test. First, although appellants claim that joint investigative efforts in Canada, Germany, and England demonstrate the requisite existing or prospective prosecution, the cases that found that a witness faced a pending or prospective prosecution within the meaning of Flanagan involved a more substantial nexus and a heightened likelihood of actual prosecution that is lacking in the instant case. See Gecas, 120 F.3d at 1425-26 (potential war crimes prosecution as a result of imminent expulsion from United States created real and substantial risk of foreign prosecution); United States v. Sealed, 794 F.2d 920, 924-25 (4th Cir. 1986) (existing prosecution and possibility of extradition created a real and substantial fear of prosecution); Moses v. Allard, 779 F. Supp. 857, 863-69 (E.D. Mich. 1991) (criminal investigation pending in Switzerland, nexus existed between information requested in proceeding and pending prosecution, and witness faced possibility of extradition, so real and

12

substantial fear of prosecution); Mishima v. United States, 507 F. Supp. 131, 132–33 (D. Alaska 1981) (where conduct was criminalized under Japanese law, and cases had been referred to a Japanese prosecutor, witnesses had demonstrated real and substantial fear of prosecution, whereas witnesses whose cases had not been referred to a prosecutor had not demonstrated such a fear); In re Cardassi, 351 F. Supp. 1080, 1083–84 (D. Conn. 1972) (questions witness refused to answer concerned events in Mexico, potential acts were incriminating under Mexican law, and Mexican authorities had expressed an interest in the case).

Second, appellants rely upon the existence of criminal antitrust laws in other nations. However, these legal codes are not as sweeping as appellants claim they are; Germany, Spain and the United Kingdom do not criminalize price-fixing, and other countries they list, such as Argentina, Chile, and the Philippines, do not generally engage in criminal prosecutions, have never done so, or do so through administrative channels. Third, appellants rely heavily on the fact that Canada has a similar criminal antitrust law, has engaged in criminal antitrust prosecutions, has an MLAT in effect with the United States, has helped in a course of evidence gathering, and has made a contact with one of their counsel, to show that they face a real and substantial fear of prosecution. However, an assertion that a prosecution may be possible, or the fact that foreign investigative authorities have engaged in inquiries, does not mandate a finding under Flanagan that appellants face an existing or prospective prosecution. See In re Grand Jury (Chevrier), 748 F.2d 100, 103–106 (2d Cir. 1984) (no evidence of current, pending investigation, only routine inquiry by Canadian government, and lack of potential named violations, so no real and substantial fear of prosecution); In re Grand Jury (Gilboe), 699 F.2d 71, 76–77 (2d Cir. 1983) (no present or prospective foreign prosecution, despite asserted claims of "shadowy investigations" and newspaper accounts, and no likely potential for extradition, so no real and substantial fear of prosecution). Therefore, the first and second requirements of Flanagan have not been met in this case.

13

As for the fourth Flanagan requirement, appellants claim that they could be extradited to Argentina, Canada, Chile, Germany, Ireland, Japan, Norway, Spain or Thailand, given the existence of treaties with these countries. However, Flanagan and related cases demonstrate that the existence of an extradition treaty, absent the presence of other factors, is not sufficient to create a real and substantial fear of prosecution. See, e.g., In re Grand Jury (Gilboe), 699 F.2d at 76-77. With respect to the use of their testimony by a foreign nation, as touched upon by the third andfifth Flanagan factors, we note that, as we discuss more fully below, appellants' argument in this regard is speculative at best.3 Accordingly, we conclude that appellants have not shown a "real and substantial fear" of prosecution.

III. Right to An Evidentiary Hearing

Appellants also claim that their due process rights were violated because the District Court refused their requests for an evidentiary hearing to question governmental officials regarding their contacts with foreign nations. They argue that they could have met the "test" under Balsys if they could have called governmental officials and questioned them, and that the District Court improperly relied on the representations of the government in the Schofield affidavits in denying such a hearing. In denying their requests, the District Court found that the government's statements that the witnesses' testimony would not be released was not overcome by the evidence adduced by appellants, and that

_____

3. Appellants argue that Rule 6(e) of the Federal Rules of Criminal Procedure regarding secrecy of grand jury proceedings gives them little comfort in this regard. The Flanagan court recognized that Rule 6(e) does not eliminate the risk of a witness's testimony being given to a foreign power. As Flanagan noted, grand jury proceedings are not "leakproof," and depend in part on the largess of government officials who have access to grand jury minutes. 691 F.2d at 123. Here, appellants argued that the government had already shared information as a matter of course with the Canadian government and its investigators; however, the District Court determined that the unsworn allegations of appellants of information sharing, in combination with the evidence appellants had produced, did not undercut the government's averments of good faith, a conclusion that we do not disturb, as we discuss infra.

14

even if their offers of proof were taken at face value, that evidence did not point to a set of circumstances that would fall within Balsys, and hence, no evidentiary hearing was necessary.

Where a witness has challenged a subpoena requiring his testimony before a grand jury, we require the government to make some preliminary showing by affidavit that: 1) the information sought is relevant to the grand jury's investigation; 2) properly within the grand jury's jurisdiction; and 3) not sought primarily for another purpose. See In re Grand Jury Proceedings (Schofield I), 486 F.2d 85, 93 (3d Cir. 1973); In re Grand Jury (Schofield II), 507 F.2d 963, 966 (3d Cir. 1975). Where the District Court is not satisfied with the government's affidavits, either because "the matters set forth challenge the court's credibility or because the witness has made some colorable challenge to the affidavits, the court can require something more." 507 F.2d at 964-65. The District Court has broad discretion in determining whether further proceedings or discovery are necessary or warranted after reviewing a Schofield affidavit, including in camera hearings, additional affidavits, or a hearing. See Schofield II, 507 F.2d at 965; Schofield I, 486 F.2d at 93. We have also noted that certain factors should inform a district court's decision as to whether the government is abusing the subpoena process: the limited scope of the inquiry into abuse of the subpoena process, the potential for delay, and any need for additional information that might cast doubt upon the accuracy of the government's representations. See In re Grand Jury, No. 98-6415, 1999 WL 150880, at *8-*9 (3d Cir. Mar. 19, 1999). Our review of a decision to deny additional review is deferential, and we will not disturb a District Court's decision unless its "weighing" was an abuse of discretion. See id. at *9.

Appellants argue that the denial of a full evidentiary hearing by the District Court was a denial of due process, and in so arguing rely on statements that where an alleged contemnor faces incarceration, due process requires an "uninhibited adversary hearing" where the witness can probe "all nonfrivolous defenses to the contempt charge." See In re Grand Jury, 13 F.3d 459, 461 (1st Cir. 1994),

15

citing In re Grand Jury (Campaigner Publications) , 795 F.2d 226, 234 (1st Cir. 1986). However, these same courts have recognized, as have we, that due process does not require a hearing in all instances where a witness faces being found in contempt, and we have limited an alleged contemnor's right to calling witnesses to those instances where there is a genuine factual dispute or where testimony is useful to bring to the court's attention relevant evidence not already developed on the record. See In re Grand Jury Matter (Backiel), 906 F.2d 78, 85 (3d Cir. 1990). Moreover, courts have noted that a District Court's discretion in determining what process is due to an alleged contemnor is very broad. See 13 F.3d at 461; see also Sanchez v. United States, 725 F.2d 29, 32 (2d Cir. 1984) (upholding order with regard to witness's custody on the basis of witness's affidavit and oral argument); Simkin v. United States, 715 F.2d 34, 38 & n.2 (2d Cir. 1983) (witness affidavit only).

As we have recently noted in In re Grand Jury:

> There is a difference between requiring evidentiary support and requiring a hearing. Neither Supreme Court precedent nor our prior decisions require that a hearing be held whenever a subpoena is challenged on reasonableness grounds. Indeed, this court has specifically rejected any such suggestion, leaving the decision to hold a hearing to the district court's discretion. . . . Nor does precedent or policy require a different rule when the challenge is a constitutional one.

1999 WL 150880, at *8 (citations omitted).

In particular, the appellants have argued that alleged instances of information sharing between the Antitrust Division and Canadian investigators and other instances of joint investigative activity involving other countries, as outlined above, created genuine issues of material fact as to whether the government was sharing information in their cases, and whether the instant prosecutions were, in fact, joint international prosecutions, and that the District Court was therefore in error in denying them an evidentiary hearing. In making its ruling on the motions for an evidentiary hearing, the court found that neither the

16

witnesses' allegations nor their proffered evidence cast sufficient doubt on the government's pronouncements to lead the court to conclude that an evidentiary hearing was necessary.4

Appellants now assert that their position is unique in that all of the evidence they require is in the hands of the government, and that the District Court should have permitted them to challenge the government's averments of good faith by calling and examining witnesses. We find that they do not face a situation all that different from any individual challenging a grand jury subpoena; we must preserve the proper balance between the grand jury's need to know and the rights of the witnesses summoned before the grand jury, and we have structured our analysis of a District Court's decisions in these matters keeping both of these interests in mind. See In re Grand Jury , 1999 WL 150880 at *8-*10; In re Grand Jury Matter (John F. Kennedy Hospital), 802 F.2d 96, 102 (3d Cir. 1986).

The District Court was aware of the nature of the inquiry before it, the interests at stake, and the manner in which the government's Schofield affidavits had been challenged by appellants. Appellants presented an array of evidence and argumentation, which the court examined at length in light of the Schofield affidavits; it determined that there was no basis for a hearing whereby appellants could question the bona fides of the government statements. Absent a genuine factual issue, or some showing of harassment or bad faith sufficient to warrant rejection of the Schofield affidavits, the District Court exercised its discretion to rely upon the affidavits and averments of the government, and

_____

4. The court did query government counsel as to whether it would be required to seek the Court's leave under Rule 6(e) to disclose testimony or proofs compelled from the witnesses to a foreign sovereign. The government opined it would be required by law to approach the court for a 6(e) order to disclose such materials. The District Court later noted that were the government to change its position in this matter regarding disclosure of material to foreign authorities, it would apply to the Court for a 6(e) order. The District Court allowed that in such a situation it would be willing then to revisit the question of an evidentiary hearing and the applicability of this case to Balsys, but emphasized that: "We are not at that point. We may never be."

17

in so doing, did not violate appellants' due process rights. See In re Grand Jury, 1999 WL 150880 at *8-*9; Backiel, 906 F.2d at 85; 802 F.2d at 102; In re Grand Jury (Schmidt), 619 F.2d 1022, 1029-30 (3d Cir. 1980). We find that the District Court's denial of appellants' request for a hearing was not an abuse of discretion in this case.

We will affirm the decision of the District Court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit